STATE OF MAINE *vs.* PARKER B. SMITH.

Androscoggin.    Opinion, April 13, 1944.

*Armand Dufresne*, County Attorney,

*Frank T. Powers*, for the State.

*Berman & Berman* of Lewiston, for the respondent.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, MURCHIE, CHAPMAN, JJ.

HUDSON, J.   The respondent, convicted under R. S. 1930, Chap. 131, Sec. 10, comes to this Court on appeal and exceptions. This statute provides in part:

"Whoever embezzles, or fraudulently converts to his own use, or secretes with intent to embezzle or fraudulently convert to his own use, money, goods or property delivered to him, or any part thereof, which may be the subject of larceny, shall be deemed guilty of larceny, and shall be punished accordingly."

By its enactment "a peculiar species of larceny" was created "where the felonious taking is wanting." *State* v. *Stevenson*, 91 Me., 107, 111, 39 A., 471, 472.

The indictment contained no counts for ordinary larceny and the presiding Justice instructed the jury that no conviction for such could be found, not only for its noninclusion, but because there was not sufficient proof of an original felonious taking of the property.

Although there were other counts in the indictment, the respondent was convicted only on Count 1 charging statutory larceny of twenty-five $1,000 Alabama Power Company bonds, hereinafter called Alabama bonds, and on Count 3 charging

the same of ten $1,000 Pennsylvania Electric Company bonds, hereinafter called Pennsylvania bonds.

While the record is voluminous, there was little conflict as to what was actually done by the respondent, but sharp issue was taken as to whether he acted either fraudulently or with felonious intent.

The defense was twofold: first, that the respondent did only what he had a legal right to do, and second, that if he had no such legal right, he acted in good faith, believing he had such, and possessed no felonious intent.

At the time of her death on December 11, 1941, these bonds were owned by Ella M. Foss, an elderly lady who lived in the city of Auburn. She left a testate estate of approximately $1,500,000, a large part of which consisted of securities.

For many years she had been well acquainted with the respondent, whose general business was that of banking. He had assisted her in her financial affairs and particularly with regard to the clipping and collection of her bond coupons. For some time, however, a Mr. Treat, whose business office was in Boston and who had been with E. H. Rollins and Sons, advised her as to investments and collected her coupons, receiving them either from the respondent or Mrs. Foss, and then remitted to her by check.

There was also a Mr. Comins of Dorchester, Massachusetts, a certified public accountant, who kept ledger accounts, anyway, of her bond transactions. Both Mr. Treat and Mr. Comins had complete lists of bonds owned by her at the time of her decease.

Mrs. Foss kept many, if not all, of her securities in her safety deposit box in the First National Bank in Auburn.

The respondent testified that in 1938 he and Mrs. Foss talked about his getting into some business with her financial assistance, but nothing was done about it until months afterwards following his investigation of some oil business in Texas. Then he claims that on May 5, 1939 she loaned him the Penn-

sylvania bonds with other securities, and later, on April 22, 1940, the Alabama bonds, also with other securities, with the right to use these bonds as collateral for loans he might make from banks and with the further right to use the money so obtained to establish himself in business.

The respondent also testified he gave receipts to Mrs. Foss on account of these two loans. They appear in evidence in State's Exhibits 7 and 9. Exhibit 7 reads as follows:

"Auburn, Maine
May 5, 1939.

"Received from Mrs. Ella M. Foss of Auburn, Maine, as a loan to be returned six months after demand, with interest, to be computed on the collateral value of the securities used the following securities:

"$10,000.  Pennsylvania Electric Co., First
          & Re. Mort. 5% due 1962
  10,000.  Brooklyn Union Gas Co., General
          Mort. 5% due 1957
  15,000.  New England Tel. & Tel. Company
          First Mort. A 5% due 1952
  15,000.  Indiana Hydro-Electric Power Co.,
          First Mort. 5% due 1958
$50,000.  Total

*Parker B. Smith*"

Exhibit No. 9, dated April 22, 1940, is of like tenor and includes the $25,000 Alabama Power Company bonds. It also appeared that there were three other loans of securities claimed to have been evidenced by like receipts.

The total amount of all of these claimed loaned securities at par value was $451,000, of which it seems $58,000 were returned, so that on July 10, 1942, following Mrs. Foss' death, he owed the estate a balance at par of $393,000. However, we

are concerned particularly with the Pennsylvania and Alabama bonds, the statutory larceny of which he was convicted.

The respondent together with a Mr. Freeman and Judge Pulsifer were named executors in her will. They qualified January 13, 1942. At the time of her death the Pennsylvania bonds were pledged with the State Street Trust Company of Boston to secure his personal loan. The Alabama bonds, although they had been pledged previously, were then unpledged and were in his deposit box in a bank in New York.

The Alabama bonds, called for payment on March 10, 1942 at 101, were sent by him to Coffin & Burr for collection. The call money at his direction was used in the purchase for him of a like amount of Green Mountain bonds, which later he sold to Coffin & Burr, who sent two checks to him in payment therefor. Payment on said checks, however, was stopped because of a news item that appeared in a Boston paper, which raised a question with them as to his actual ownership of the bonds. Eventually these checks were paid following certain additional endorsements by the estate's executors and thus, according to the bill of exceptions, "The bulk of the proceeds of the sale of the Green Mountain Bonds was subsequently repaid to the Estate."

The Pennsylvania bonds likewise were called on April 11, 1942 at 105. They were withdrawn from pledge in the State Street Trust Company by the respondent on May 1, 1942, and sent in for collection. This call money was paid to him and he admitted that he used it in connection with his privately owned plastic business in Long Island, N. Y.

It also appeared that the respondent's co-executors, Freeman and Pulsifer, had no knowledge as to the claimed Foss and Smith agreement, or the above-mentioned receipts, or the disposition of the bonds and the use of the call money by him until some six months following their qualification as executors. On July 8, 1942, the co-executors, together with the respondent's secretary, Miss Parker, met at the First National

Bank in Auburn (Mr. Smith not then being in town) and opened the Foss deposit box, to which Mr. Freeman had the key. They then were led to believe that some bonds were missing. Two days later, on the tenth, they met again at the bank and this time Mr. Smith was with them. Freeman and Pulsifer had lists of the Foss securities which they had obtained from either Treat or Comins. On that day they were there to clip coupons to be sent in for collection. There then appeared clipped New England Tel. and Tel coupons produced by the respondent, but without any corresponding bonds in the box. Upon inquiry he said he had clipped these coupons by mistake the last time he was there. The co-executors expressed their intention to check the bonds in the box with their lists, whereupon, they testified, the respondent sent his secretary out of the room, saying she knew nothing about something he was going to tell them. Immediately, taking his brief case, he went into another room in the bank, but returned a short time later with his case and some envelopes in his hand, in one of which envelopes, so the co-executors said, the receipts were enclosed. The respondent, however, testified that he left the room to get some carbon paper and that he sent his secretary out to complete the detail of making up the certificates preparatory to sending the coupons in for collection. He denied that he brought back the receipts in those envelopes, but said in effect that on that day in their presence he had taken the envelope containing the receipts out of the deposit box. Anyway, it was then for the first time the respondent told his co-executors that Mrs. Foss had loaned him any bonds and that he had receipted for them, and this information was not divulged until he knew they were about to check her bonds with their lists. Even then he did not tell them that he had already collected the call money on the Alabama and Pennsylvania bonds and had spent it for his own benefit.

The respondent did not deny that he withheld this information, but attempted to excuse it by asserting that he desired to

use the proceeds of the Pennsylvania bonds to protect his plastic business in which he then had great faith, so that in due time, with orders from the General Electric in mind, he could pay up his total indebtedness to the banks and then return the securities to the estate. He testified that he thought that he had the same right to use the call money from the Pennsylvania bonds that he had under the agreement with Mrs. Foss to pledge the bonds.

He also testified that once in 1938 or 1939, when Mrs. Foss was in Florida, he talked with her in regard to the use of call money. Of this conversation he said:

"If any bonds were called while she was away I could use the proceeds, pending her return, when the matter would be adjusted or new collateral take the place of the called bond."

The jury could have found that the arrangement had by him with Mrs. Foss, if there were such and if the receipts were actually given, was that he could only *pledge* the bonds as collateral for loans of money obtained by him, such loaned money to be used by him for his own purposes in establishing himself in business, with this exception, that if any bonds were called while she was away from home, he could collect the call money, use it for his own purposes, and then adjust with her upon her return home. But this call money in both instances was collected following her death.

The State contended that of the facts proved by it to show fraud and felonious intent the following were salient: when on May 12, 1942 he sent the Pennsylvania bonds in for collection and remittance, together with the ownership certificate, he stated in the certificate that he was the owner of the bonds and did not disclose any rights of the Foss estate to the same, although the certificate form stated, "A fiduciary must disclose the name of estate or trust"; he did not want his private secretary to have knowledge as to what he had done with the Foss bonds; had

she remained in the bank when he sent her out she might have heard him make some statement that she knew was untrue; once he made a report to Mr. Comins that he had deposited Federal Land Bank bond coupons to the value of $375.00, when in fact the coupons so deposited were in the amount of $210.00 and the balance was in cash; he concealed from his co-executors the loss of eleven of the Federal Land Bank as well as ten of certain Argentine Republic bonds; and he admitted that any interruption of his privately owned business at the time of the alleged fraudulent conversions would have spelled disaster to such business.

Two issues were raised: first, did the respondent have a legal right to do what he did? If he did, he would not be guilty. Second, if he had no such legal right, did he act fraudulently or with felonious intent, for if not he could not be found guilty?

Of the exceptions taken, seventeen in number, 1, 2, 3, and 13 were expressly waived.

### *Exceptions 7, 8, 9, 10, 11, and 16*

These were taken to instructions in the Judge's charge. The defense claimed that the relationship between Mrs. Foss and the respondent was contractual; that the loan of the bonds in each instance was in the nature of a bailment; that until the bailment was legally terminated, he had a right as bailee to do what he actually did with the bonds; and that neither the death of Mrs. Foss nor his qualification as executor put an end to his rights. It contended that his lawful possession as bailee continued in him as an individual, that the bonds did not come into his possession as executor because the bailment had never been terminated, and therefore he could not be found guilty under the statute on which the indictment was drawn. It claimed further that there was no obligation to return the bonds until six months after demand and that no demand had

been made before the date of the alleged fraudulent conversions or embezzlements.

The essential parts of the instructions excepted to are:

1) "And I instruct you now, as a matter of law, that when this man became executor, had qualified as executor of this elderly lady, that, as a matter of law, the title of all of her personal property and bonds was transferred, the title to the personal property vested then in her executors of which this man was one. . . . And I instruct you, as a matter of law, that her executors had the right to possession."

2) " . . . his possession as an individual then became his possession . . . as an executor. He became a fiduciary, and it was his duty, with the others . . . it was his duty at her death to get possession of her property."

3) " . . . The law itself, no matter how he had obtained them, at that time changed the possession from him as an individual to him as an executor."

4) " . . . His duty was to gather those assets, just as it was the duty of the others. . . . If he had a lien on them, if he had a right to them of some sort, when they were gathered, that lien should be settled by the law and by the facts as they are."

5) " . . . It isn't his duty and it isn't his right to stand out representing her, as her fiduciary, to stand out with a claim consistent, beneficial to himself, inconsistent and not beneficial to the estate."

6) " . . . but I say it is the duty of a fiduciary in a claim which he has, if it is a claim against the estate and to the disadvantage of the estate, he should do one thing or the other. He should cease himself as an individual claiming against the estate, something against the estate. He should not be an executor. Or

if he remains an executor he should not be claiming against the advantage of the estate something which is doubtful, at least. . . . He is there to guard the estate's interests, and if he has a claim, one concerning which there is a question, then he should not press it against the estate while he is executor, and, perhaps, rule on it when he has a right to not be executor. But at any rate, he cannot use advantages to his own interest against the estate, nor should he construe doubtful things in his own favor rather than the estate's favor."

Counsel for the respondent in their brief say:

"We do not believe we are over-simplifying the issue by asking the question, had the respondent done in the lifetime of Mrs. Foss what he did after her death, could she have brought an action against him for conversion of the bonds?"

That, however, would not be the test here, for it omits that which is vital, namely, the respondent's qualification as one of the executors of the will. The presiding Justice we think, *on the facts herein,* correctly instructed the jury in effect that when he qualified as executor, he made an election. He swore allegiance to the estate. He could not serve two masters. Where his and the estate's interests conflicted, it was his sworn duty to serve the estate faithfully and with the same fidelity that one who had no conflicting interests would serve. "An executor or administrator is deemed unsuitable when he has any conflicting personal interest which prevents him from doing his official duty" and may be removed. *Putney* v. *Fletcher,* 148 Mass., 247, 248, 19 N. E., 370.

Thus, the respondent's decision to qualify as executor placed him in a position where he could not rightfully retain individual possession of the bonds until a demand were made for their

return, unless his right so to do were determined in proper proceedings.

True, as an individual he had certain rights under the agreement and they were not cut off simply by the death of Mrs. Foss. He could still have pledged the bonds loaned him until their return were demanded by the legal representatives of the estate and thereafter for a six months' period. But by his own decisive act (qualification as executor) he forswore the enjoyment of those rights unless and until his private rights were Court determined.

In *Hodge* v. *Hodge,* 90 Me., 505, 38 A., 535, 536, 40 L.R.A., 33, 60 Am. St. Rep., 285, it was held that a debt to a testator becomes by the debtor's appointment as executor an asset of the estate. Therein is quoted an early Massachusetts case, *Sigourney et al., Administrators* v. *Wetherell, et als.,* 6 Met., 553, 557, 558, as follows:

"It is now well settled, whatever may have formerly been the rule of law, that a testator, by making his debtor executor, does not give him the debt, by way of legacy, nor release or discharge it. In this respect, he now stands on the same footing with an administrator. But as an executor or administrator can not demand or receive payment of himself and can not sue himself, and yet is bound to account for his own debt, that debt must be considered as assets. Where the same hand is to pay and receive money, the law presumes, as against the debtor himself, that he has done that which he was legally bound to do, and charges him with the amount as a debt paid."

Also see *Ipswich Manufacturing Co.* v. *Story, Executor,* 46 Mass., 310, 313.

The law in *Hodge* v. *Hodge,* supra, has recently been reaffirmed in *United States of America, Appellant,* 137 Me., 302, on page 308, 19 A., 2d, 247, 249, where it is said:

" . . . when a person is appointed as the executor or administrator of an estate, who is himself debtor to the estate, the debt is not extinguished and such personal representative must account for the same as assets in his hands."

Speaking of *Stevens, Admr.*, v. *Gaylord*, 11 Mass., 256, a leading case on this subject, our Court in *Stewart* v. *Hurd*, 107 Me., 457, stated on page 460, 78 A., 838, 32 L.R.A.N.S., 671, Am. Cas., 1912D, 662:

"The doctrine of that case is the more logical and equitable one that neither in the case of testate nor intestate estates is the debt itself extinguished or released without payment, but the right of action is discharged or suspended because the executor or administrator cannot maintain an action against himself. Because of this impossibility of action, the rule was adopted that such indebtedness should be regarded as prima facie assets in the hands of such executor or administrator."

And later on page 461 of 107 Me.:

"Having voluntarily accepted the duties, pertaining to an executor or administrator, he is estopped from treating his own indebtedness other than as an asset of the estate. 'To allow him to accept the office and then to settle the amount which the creditors and others interested in the estate would have got had he not taken the office but had allowed some disinterested person to be appointed to enforce these rights, would not be doing justice to those whose rights the law undertakes to preserve.' *Bassett* v. *Fidelity and Deposit Co.*, 184 Mass., supra, at page 212."

It is also stated on page 212 in the *Bassett* case, supra, 184 Mass., 210, 68 N. E., 205, 100 Am. St. Rep., 552:

"But there is another side to the case. An executor or administrator is appointed for the sole purpose of enforc-

ing in behalf of those interested in the estate the rights of the estate against others. When the estate has a claim against the executor or administrator himself, he is incapacitated from performing that duty and taking to himself that office. For that reason, on broad principles of policy it was laid down by the common law of England *that he must yield all controversy as to the debt due from himself and treat it as an asset of the estate. No one is bound to accept the office, and if he elects to do so he thereby tacitly assents to this condition.*

*"The common law did not allow him to accept the office and keep his rights in a controversy when his duty and his personal interest were in a direct conflict."* (Italics ours.)

In that case it was also stated on page 215, page 206 of 68 N. E.:

"Even if a demand had been necessary, the defendant cannot set up that no demand was made, as he seeks to do. It was his duty as executor to make a demand and he could not set up that he could not make a demand on himself."

The last quoted statement is pertinent here, inasmuch as the respondent claimed the right to retain possession of these bonds until a demand were made for their return. This case was cited with approval in *King* v. *Murray*, 286 Mass., 492, on page 495, 190 N. E., 526.

In holding as we do on this point, we feel that also as a matter of public policy we have taken the correct view. We are dealing with one's estate whose voice cannot now be heard. Such an estate should be safeguarded against all conflicting, unadjudicated claims presented by an executor. He should not himself be permitted to determine a controversy between himself as executor and himself as an individual.

From the date of his qualification on January 13, 1942, to the acceptance on September 8, 1942 of his resignation tendered on July 20, 1942, there was no Court adjudication. Instead, he himself, even without the knowledge of his co-executors or of others interested in the estate, adjudged his claim valid and disposed of the bonds as hereinbefore set forth.

The presiding Justice in instructing the jury as he did had before him facts devoid of any judicial determination of the respondent's rights following his qualification as executor.

However, in the instruction attacked in Exception 10, the Court did tell the jury that if the respondent "had a lien on them" (meaning the bonds) "if he had a right to them of some sort, when they were gathered, that lien should be settled by the law and by the facts as they are."

Furthermore, the Court gave this final instruction:

"I am informed by the State that I instructed you that the executor could not have a claim against the estate. I did not intend to convey that impression. I said that if an executor, or meant to say that if an executor had a claim against the estate he could not be acting on his own initiative inconsistent with the rights of the estate and construing things in his own favor and against the estate. Of course, I did not mean he could not come into the courts and have it considered some place. And I think I did tell you that, but if I didn't tell you, of course, there is in the Probate Court, for instance, a method of filing claims against the estate; and I did not intend to convey and it would not be germane to this case at all about not being able to file one or having the right to file one in the Probate Court. As I say, I want to eliminate that."

Thus the Court did instruct the jury to the effect that whatever private rights he would claim against the estate he could not construe against it, nor determine "on his own initiative,"

but had the right to present the same to the Probate Court for its determination. Failing so to do, he could not lawfully rely upon his own belief as to such rights and act as though they had been established in the probate court. When he qualified as executor he estopped himself to deny the right of the estate to have immediate possession of the bonds. He was duty bound to deliver them to the legal representatives of the estate without awaiting any demand and to rid himself of any individual possession. Consequently, he had no right as an individual to do what he did following his qualification as executor and dispose of the bonds for his own personal use and benefit. Nevertheless, he would not be guilty under said Sec. 10, unless his conversion was fraudulent or unless he acted with a felonious intent.

The respondent takes nothing under Exceptions 7, 8, 9, 10, 11, and 16.

### Exceptions 12, 14, and 15

These exceptions were to refusals to give requested instructions. The first of these instructions was this:

"The State must prove beyond a reasonable doubt that the Respondent had a felonious intent to convert the property to his own use. And, if you find that the Respondent, in good faith, believed that he had the right to pledge these bonds for his own use, and did so in that belief, then the State has not proved his felonious intent, even though by law he did not have the right to do so."

We regard this as not an inaccurate statement of applicable law, provided the belief is "honest and well-founded." *State* v. *Morin*, 131 Me., 349, 352, 163 A., 102, 103. However, we think that the respondent takes nothing under this exception for the reason that in the charge it had been made sufficiently clear to the jury that such was the law. When the Judge refused the re-

quest he stated that he thought he had already given it in the charge. He then continued on with some remarks and finally said this:

"... if he didn't intend to steal and honestly thought he had the right and that was an honest thought, later as a fact it appeared he had no right, and you should find he had no intent to steal or embezzle your verdict should be not guilty."

Therefore, he had dealt at length with this part of the respondent's defense, namely, that what he did was done without any felonious intent. One cannot read that portion of the charge without coming to the conclusion that the Judge made it perfectly plain to the jury that in order to secure a conviction the State must prove felonious intent beyond a reasonable doubt, even though the respondent did that which he had no legal right to do.

Exceptions 14 and 15 related respectively to the following refused instructions, namely:

1) "If Mrs. Foss, in her lifetime, authorized Parker B. Smith to use the proceeds of these bonds for his own property, and in his own business, with the understanding that he was to return the bonds, or the proceeds thereof six months after demand, then he cannot be guilty of embezzlement, either of the bonds or of the proceeds thereof, and he must be found not guilty of all the counts of this indictment," and

2) "If the Respondent was given the right by Mrs. Foss, in her lifetime, to use the bonds as collateral in his own business, and if you find that she gave or loaned him the bonds for that purpose, and if you also find that he, in good faith believed that he had the right to use the proceeds of those bonds for his own purposes, by virtue of his original understanding with

her he cannot be guilty of embezzlement either of the bonds or the proceeds thereof, even though he legally would not have had the right so to do."

The first requested instruction was properly refused because it omitted the vital fact of his executorship and assumed that following the respondent's qualification as executor he could himself while executor determine and exercise his claimed private rights under the agreement.

The second requested instruction relates to the second ground of defense, namely, innocent action upon the part of the respondent. What we have said in connection with Exception 12 is here pertinent and need not be restated.

### Exception 4

This exception was taken to a ruling of the Court permitting Mr. St. Gleason, a State witness and an employee of Coffin & Burr, to testify as to the reason why that firm stopped payment on the two checks it had sent to the respondent in payment of the purchase price of the Green Mountain bonds. His answer was:

"We read this article in the Boston Post, in the morning paper of July 28th, and after reading it we felt that we couldn't be sure at all that this money was being paid to the right person. Therefore, we thought—on advice of counsel, after we consulted with counsel, that we had better stop payment and see what developed."

It was objected that this testimony was irrelevant, immaterial, and prejudicial. It will be recalled that the State claimed that the respondent, following his qualifications as executor, sent the Alabama bonds to Coffin & Burr for collection of the call money. This Coffin & Burr did, and held the proceeds on direction of the respondent. Later he ordered that Green Mountain bonds be purchased with those proceeds. This was

done. Then still later the respondent sold the Green Mountain bonds to Coffin & Burr, who sent him the checks in question, on which stop-orders were issued.

All this, the jury could have found, was done by the respondent as an individual and not as executor. It is true that the checks (made out to his individual order) were directly in payment of the Green Mountain and not the Alabama bonds, but the State was giving the history of the transactions with relation to the latter bonds with whose statutory larceny the respondent was charged. It was attempting to establish what he did from the time of his acquisition of the Alabama bonds until they, the subsequently purchased Green Mountain bonds, and the call money from both kinds of bonds passed out of his control, in order to determine whether any of his acts in regard thereto evidenced felonious intent or fraudulent conversion of the Alabama bonds.

Where subsequent acts, even though not in issue, tend to establish intent of the party in doing the acts in question, they are admissible. *Nickerson* v. *Gould,* 82 Me., 512, 515, 20 A., 86; *Perlin* v. *Rosen,* 131 Me., 481, 483, 164 A., 625.

No objection was made to evidence showing the purchase of the Green Mountain bonds for the respondent with the call money from the Alabama bonds, nor to the sale by him to Coffin & Burr of the Green Mountain bonds, nor to the fact of issuing and sending the checks to him, nor to the stop-orders of payment. Those facts were all before the jury. Then the question was asked why were payments stopped, and the Court permitted the reason therefor to be given. The answer cleared up a query that might well have puzzled the jury. Without the explanation, they might have inferred reasons much more harmful to the respondent than the reason given.

But if it be assumed that there were prejudice, it would seem to have been cured by testimony given by the respondent himself later in the case, for then he testified voluntarily as to the publicity that resulted from published accounts of the pro-

bate court proceedings in which he was directly charged with embezzlement. This publicity, he said, interrupted his negotiations to convert his plastic business into a contract, from which he expected to realize profits which would have enabled him to pay his bank loans and restore the bonds to the estate.

Furthermore, "A just verdict is not to be set aside because of a slight but comparatively harmless error in the omission or rejection of evidence." *State* v. *Priest*, 117 Me., 223, 231, 103 A., 359, 363. Mere technical error will not justify a new trial. The prejudice must be substantial. A just verdict will not be lightly set aside. *State of Maine* v. *Cloutier*, 134 Me., 269, 278, 186 A., 604.

For reasons stated, we do not feel that this exception should be sustained.

### *Exception 5*

On cross-examination the State was permitted to interrogate the respondent in regard to certain Argentine Republic and Federal Land Bank bonds which he claimed he had misplaced. The defense objected to question as to whether or not he had concealed information as to the misplacement from his co-executors and from Messrs. Treat and Comins. The State in its elicitation of this testimony was attacking his claim of innocent action. The defense contends that the Court erred in admitting this evidence for the reason that it was irrelevant, immaterial, and prejudicial and had to do with bonds other than those that the State claimed the respondent had embezzled or fraudulently converted.

There were twenty-five $1,000 Federal Land Bank and twenty $1,000 Argentine Republic bonds. The respondent testified that eleven of the Federal had been misplaced and of the Argentine Republic, ten. They were not found afterwards. What actually became of them the record does not disclose. He admitted that he deposited the coupons of the bonds not misplaced and substituted cash for the coupons on those that

were misplaced, and then over objection of his counsel, he testified that he gave no information to his co-executors or to Treat or to Comins as to the missing bonds or as to the manner of deposit.

While he was not charged with embezzlement or fraudulent conversion of the Federal and Argentine bonds, they appeared in State's Exhibits 10 and 11, which were two of the five receipts which the respondent testified he had given to Mrs. Foss under the same agreement as to use and return of the same. All five receipts are practically identical in language, and evidence like transactions resulting from one general agreement.

"... in cases where knowledge of intent of the party was a material fact, evidence of other facts happening before or after the transactions in issue, have been received in evidence, although they had no direct or apparent connection with it. Such facts, if they tend to establish knowledge *or intent,* when that is material, although apparently collateral and foreign to the main issue, nevertheless, have a direct bearing and are admissible. . . . 'Whenever the intent of a party forms a part of the matter in issue, upon the pleadings, evidence may be given of other acts, not in issue, provided they tend to establish the intent of the party in doing the acts in question.' " *Nickerson* v. *Gould,* 82 Me., 512, supra, on page 515. (Italics ours.)

Also see *State* v. *Witham,* 72 Me., 531, 534, 535; *Nichols* v. *Baker,* 75 Me., 334, 336, 337; *State* v. *Acheson,* 91 Me., 240, 244, 39 A., 570; *Wood* v. *Finson,* 91 Me., 280, 284, 39 A., 1007; and *Peacock* v. *Ambrose,* 121 Me., 297, 299, 116 A., 832.

"... evidence of similar acts may frequently be relevant, especially in actions based *on fraud and deceit,* because of the light which it throws on the state of mind of a person, as, for example, his knowledge, or motive or intent." Sec. 580, 32 C. J. S., 436. (Italics ours.)

The issues between the State and the respondent so far as this part of his defense was concerned related to *felonious* intent and *fraudulent* conversion.

Furthermore, "An issue as to the existence or occurrence of a particular fact, condition, or event, may be proved by evidence as to the existence or occurrence of similar facts, conditions, or events, under the same, or substantially similar, circumstances." Sec. 584, 32 C. J. S., 438, § 584.

In *Eaton* v. *Telegraph Company*, 68 Me., 63, Judge Peters said on page 67:

> "How far evidence of facts may be admissible to show the probability or non-probability of a main fact in issue, is one of the most troublesome questions in the law. Generally, collateral facts are not admissible. The evidence must be relevant. The difficulty is to decide what is and what is not relevant evidence. . . . But here, the dealing inquired about was between the same persons at the same time and relating to the same kind of property. The reason of the rule which excludes irrevelant testimony admits such as this."

The issue in the *Eaton*, supra, case was whether A was the owner of certain certificates of stock in his possession or was merely the custodian of them for B, the certificates having been issued to A and bearing upon their backs assignments by A to B, and it was held that it was competent for B to show that A at the same time held in his possession as custodian for B *other* certificates in the same company issued directly to B and belonging to B. This case was later cited with approval in *Rawson* v. *Knight*, 73 Me., 340, on page 343, in which it was held that "To strengthen the probability of the fact contended for by the plaintiff, he was permitted to show that the person, upon whom the service was made, had been, and at that time was, the defendant's agent and attorney in *other* business connected with the same estate." (Italics ours.)

In *State* v. *Witham*, 72 Me., 531, supra, it is stated on page 537:

" 'Relevancy is that which conduces to the proof of a pertinent hypothesis. Hence it is relevant to put in evidence any circumstances which tend to make the proposition at issue more or less improbable.' Whar. Ev. Sections 20, 21. In *Trull* v. *True*, 33 Me., 367, it was held, that 'testimony cannot be excluded as irrelevant, which would have a tendency, however remote, to establish the probability or improbability of the fact in issue.' " Also see *Wood* v. *Finson*, 91 Me., 280, 284, supra.

Claimed concealment of the misplacement of the Federal and Argentine bonds and manner of deposit of the coupons thereon accorded with the admitted withholding of information from his co-executors in relation to his transactions with the Alabama and Pennyslvania bonds. Both asserted concealments tended to show that he was not open and frank with his co-executors and were relevant on the issues of fraud and felonious intent.

Besides, this evidence was brought out on cross-examination. " 'In cross- examination . . . the rule' " (as to admissibility of evidence of collateral matter) " 'is not applied with the same strictness; on the other hand great latitude is allowed by the Judge, in the exercise of his discretion, when from the temper and conduct of the witness, such course seems essential to the discovery of truth.' " *State* v. *Kimball*, 50 Me., 409, 414. Also see *State* v. *Taylor*, 131 Me., 438, 439, 163 A., 777, and *State of Maine* v. *Hume*, 131 Me., 458, 461, 164 A., 198.

We detect no exceptionable error in the admission of this evidence.

### Exception 17

This exception was taken to the refusal of the trial Judge to grant the respondent's motion in arrest of judgment. In the motion were set forth many grounds for the arrest, but only four

are now presented by respondent's counsel. The first two propound these questions:

"*First*: Is it encumbent upon the State to allege ownership of the property?

"*Second*: If such allegation is necessary, has the State properly set it forth?"

Without answering these questions as asked, it is necessary to state only that both Counts 1 and 3 contain sufficient averment to satisfy the requirements of pleading for a valid conviction under said Sec. 10. The statute does not itself specifically require that there shall be any allegation of ownership of the property. Conviction should follow proof beyond a reasonable doubt that one has embezzled or fraudulently converted to his own use property *delivered* to him which may be subject to larceny.

While it is true that in *State* v. *Walton*, 62 Me., 106, the one indicated was a public officer, namely, a tax collector, wherein it was held that it was not necessary to allege ownership in another, yet the Court said on page 109:

"In order to ascertain whether an indictment can be maintained against an offender of either of these three classes, we must look to see whether it includes allegations of those facts which the legislature have declared essential to constitute the offence which it purports to charge. Beyond these we are not to seek. It is not for the court to require either allegation or proof of that which the legislature have omitted in their definition of the crime . . . ."

Under Sec. 10 it is "delivered to him" property of which he may be guilty of embezzlement or fraudulent conversion. We think the word "delivered" as used in this statute was intended to mean property entrusted to him in some fiduciary capacity. One does not ordinarily entrust his own property to himself in a fiduciary capacity. The word "delivered" would seem to

have been intended by the legislature sufficiently to denote property belonging to another without statement of whose property it was.

In this indictment the language of the statute was employed. Delivery of the property, stated to be that which had belonged to Mrs. Foss at the time of her decease and which had been disposed of in her will, was alleged to have been made to and received by the respondent as executor. Thus was negatived any possibility that it was the respondent's own individual property. Under the alleged facts he was apprised that the claim of the State was that he as one of the executors was the owner of the property.

In *State of Maine* v. *Strout*, 132 Me., 134, 167 A. 859, our Court stated on pages 135 and 136:

"An indictment describing an offense in the language of the statute is sufficient. This commonly repeated rule is ordinarily correct. . . . It, however, depends upon the manner in which the offense is defined in the statute. If the statute does not sufficiently set out the facts which make the crime, so that person of common understanding may have adequate notice of the nature of the charge which he is called upon to meet, then a more definite statement of the facts than is contained in the statute becomes necessary. . . . It is not enough that the indictment detail the facts from which an offense may be implied, or only so many of the essential elements as might suggest all the other elements; it must specify everything necessary to criminality."

Sec. 10 in our judgment does "sufficiently set out the facts which make the crime, so that a person of common understanding may have adequate notice of the nature of the charge which he is called upon to meet." That being so, employment of the language of the statute in the indictment was legally sufficient. Everything necessary to criminality under the statute

was specified in this indictment and demurrer thereto could not have been sustained.

The allegations in the counts in the indictment (based on said Sec. 10) in *State* v. *Snow*, 132 Me., 321, 170 A., 62, so far as ownership of the property is concerned, are practically identical with those in Counts 1 and 3 in this indictment. In that case it was averred that the property was in the decedent at the time of his death, that the respondent qualified as administrator of his estate, and that that property which had been the deceased's in his lifetime was delivered to the respondent as administrator and came into his possession and was received by him in that capacity in trust and confidence. The counts in the case at bar would seem to have been patterned on the *Snow,* indictment. In the *Snow* case the respondent demurred to the indictment. Exceptions were taken to the ruling below sustaining the indictment and these exceptions were overruled by this Court.

The third and fourth questions raised in this exception are these:

"*Third*: Is it necessary for the State to allege the delivery to and receipt by the respondent of the property by virtue of his office as executor?

"*Fourth*: Did the indictment contain such a proper allegation?"

We answer yes to both questions.

The attack herein made on the indictment is that delivery was not alleged properly inasmuch as "a very vital word is lacking from the indictment and that word is 'were.' " This omission occurred in both counts 1 and 3, that is, as to both the Alabama and the Pennsylvania bonds.

The bonds claimed to have been embezzled or fraudulently converted having been described in Count 1 in the indictment, these words follow:

" . . . each of said bonds being then and there of the value of one thousand dollars, and the said bonds being the property of the said Ella M. Foss aforementioned at her decease, to wit, on the eleventh day of December, in the year of our Lord nineteen hundred and forty-one, and which said bonds were part of the property of the said Ella M. Foss disposed of by and in the will of the said Ella M. Foss and codicils thereto aforementioned, and which said bonds were on said tenth day of March, in the year of our Lord nineteen hundred and forty-two at said Auburn, in said County and State, the subject of larceny, *and which said bonds, on said tenth day of March, in the year of our Lord nineteen hundred and forty-two, at said Auburn, in said County and State, delivered to the said Parker B. Smith and received by the said Parker B. Smith in trust and confidence as executor of the will of the said Ella M. Foss* . . . . "

Like language appears in Count 3. It will be observed that the sentences in both counts comprised several clauses and that the word "were" was used in each of the preceding, but probably by clerical, grammatical, or syntactic error was omitted in the particular clauses now in question.

Is such omission fatal? We do not think so. Certainly the respondent was not misled by that omission, nor was there any failure to apprise him sufficiently of the charges there made against him. We regard language in *State* v. *Littlefield,* 122 Me., 162 on page 163, 119 A., 113, as here appropriate:

"This court is of the opinion that the time has come when mere refinement of pleading should not be invoked as a subterfuge for the escape of manifest violators of the criminal law. When an indictment employs the use of language which makes clear and unambiguous the offense with which the respondent is charged, and enables him to fully comprehend the charges and make full de-

fense to every allegation in the indictment, we are of the opinion that such indictment is sufficient and should not be quashed, because it does not happen to be couched in that technical language and form required by the courts in pleadings, when the law required the infliction of the death penalty for stealing a sheep or imprisonment for life for committing what now may be called a misdemeanor."

Also see *State* v. *LaFlamme*, 116 Me., 41, where it is stated on page 43, 99 A., 772, 773:

" . . . if the meaning of an indictment is clear so that the accused is thereby informed of the precise charge which he is called upon to meet, verbal inaccuracies, grammatical, clerical or orthographical errors, which are explained and corrected by necessary intendment from other parts of the indictment, are not fatal."

*Exception 6 and the Appeal*

Finally we come to Exception 6 taken to denial of respondent's motion for a directed verdict and the appeal from the denial of the trial Judge to set the verdict aside. These present like questions and "accomplish precisely the same result." *State* v. *Bobb*, 138 Me., 242, 245, 246, 24 A., 2d, 229, 231.

Preceding their discussion of this exception and the appeal, respondent's counsel directed an attack upon the Court's charge as a whole, claiming that it was full of error, obscure, and confusing "so as to leave the jury in dark doubt as to what was the law to be applied by them in their deliberation."

The alleged errors in the charge have already been discussed as well as the denied instructions, and we have held that there were no erroneous rulings which would warrant us in sustaining any of the exceptions thereto. The attack of obscurity and confusion is not well founded. We believe that the jury ex-

perienced no difficulty because of the asserted obscurity and confusion. Apparently they considered that the law was made clear to them, for, although they were told by the Court that they would have a right to ask for further instructions, they did not.

Complaint is made of omissions to charge as to some elements of the crime and that the Judge did not read the statute to the jury on which the indictment was drawn.

In Sec. 104 of Chap. 96, R. S. 1930, it is provided that "During a jury trial the presiding justice shall rule and charge the jury, orally or in writing, upon all matters of law arising in the case . . . . " Yet an attorney has a duty in connection with such trials and ordinarily he cannot take advantage of such an omission unless before the jury retires he calls the attention of the Court to it. He cannot sit by, remain silent, and secure an advantage when, as an officer of the Court, he should call the Court's attention to such omission.

"If either party thinks any material matter has been misstated, or over-stated, *or omitted,* he should ask for proper corrections before the jury are finally sent out. He ought not to be silent then, when corrections can be made, and complain afterwards, when corrections can not be made." *Murchie* v. *Gates,* 78 Me., 300, 306, 4 A., 691, 701. (Italics ours.)

Also see *State* v. *Fenlason,* 78 Me., 495, 501, 7 A., 385.

While the Court itself by such an omission would not comply fully with the statute (perhaps through inadvertence or diversion of mind), yet the litigant (no exception being taken) cannot in this Appellate Court, except as hereinafter stated complain if his attorney is at fault in not then making it possible for the jury to receive an omitted instruction.

Rule of Court XVIII pertinently provides in part:

"Exceptions to any opinion, direction or *omission* of the

presiding justice in his charge to the jury must be noted before the jury, or all objections thereto will be regarded as waived." (Italics ours.)

In *Poland* v. *McDowell,* 114 Me., 511, our Court stated on page 512, 96 A., 834, 835:

"This rule was declared in *McKown* v. *Powers,* 86 Me., 291, to be merely an affirmance of a long pre-existing rule of practice. It is true that this rule is not always enforced. Exceptions not reserved before the jury retires are sometimes allowed as a matter of grace, but not as a matter of right. The excepting party is not entitled to them as of right. The presiding Justice is not required to allow them."

In the instant case no exceptions were taken to such claimed omissions. However, this Court has in certain cases reviewed questions of law both on a motion for a new trial and on appeal, even though exceptions were not taken. *State* v. *Wright,* 128 Me., 404, 148, A., 141; *State of Maine* v. *Mosley,* 133 Me., 168, 175 A., 307; *Trenton* v. *Brewer,* 134 Me., 295, 186 A., 612; *Springer* v. *Barnes,* 137 Me., 17, 14 A., 2d, 503; *Megquier* v. *De Weaver,* 139 Me., 95, 27 A. (2d), 399; and *Cox* v. *Metropolitan Life Ins. Co.,* 139 Me., 167, 28 A. (2d), 143.

Such review, however, is not compatible with best practice, and although there be error in an instruction, when no exception is taken, a new trial either on appeal or motion should not be granted unless, as stated in the above cited cases, "error in law . . . was highly prejudicial . . . and well calculated to result in injustice," or "injustice would otherwise inevitably result," or "the instruction was so plainly wrong and the point involved so vital . . . that the verdict must have been based upon a misconception of the law," or "When it is apparent from a review of all the record that a party has not had that impartial trial to which under the law he is entitled. . . . " We consider the foregoing applicable as well to an omission as to an errone-

ous instruction where no exception is taken. We hold that the case at bar does not come within the exceptions to the general rule.

In discussing the appeal it should be stated again that as to the facts proven there was very little dispute. The conflict arose almost wholly over what were proper inferences to be drawn from the facts proven as to *felonious* intent and *fraudulent* conversion. What was his state of mind? What motivated his act? When he converted the Alabama and Pennsylvania bonds into call money, did he then have "an honest and well-founded belief" that he had the right so to do? Did his claimed innocence of action have actual existence? The jury answered no to these factual questions. On the appeal the only question before us is whether in view of all the testimony the jury was warranted in believing beyond a reasonable doubt that the respondent was guilty. *State* v. *Lambert,* 97 Me., 51, 52, 53 A., 879; *State* v. *Albanes,* 109 Me., 199, 201, 202, 83 A., 548; *State* v. *Priest,* 117 Me., 223, 227, 103 A., 359; *State* v. *Di Pietrantonio,* 119 Me., 18, 19, 109 A., 186; *State* v. *Gross,* 130 Me., 161, 163, 154 A., 187. A careful and painstaking study of the record convinces us that the jury was so warranted.

> *Exceptions overruled.*
> *Appeal dismissed.*
> *Judgment for the State.*