**STATE of Maine**

**v.**

**Bruce C. WEEKS.**

Supreme Judicial Court of Maine.

Nov. 3, 1970.

A. MacNichol, Asst. County Atty., Portland, for plaintiff.

Wallace J. Campbell, Portland, for defendant.

Before DUFRESNE, C. J., and WEBBER, MARDEN, WEATHERBEE and POMEROY, JJ.

WEATHERBEE, Justice.

On appeal.

After trial before a Cumberland County Court and jury the Defendant was adjudged guilty of assault of a high and aggravated nature. He entered an appeal and counsel was appointed to present his appeal to this Court.

The evidence presented at his trial disclosed that a break had been made near midnight December 10, 1969 at the E. G. Foden Executive House on Western Avenue in South Portland. Edward Vogler, a South Portland police officer, who arrived at the scene soon after 12:30 was sent by his superior to cruise the back roads around the Industrial Park where Foden's is located. He was ordered to look for a man who was described as being approximately 6 feet 2 or 3 inches tall, weighing 190 to 210 pounds, with brown hair and wearing dark clothes. The jury was not told the basis for this description.

At about 1:00 A.M. the officer was cruising the Exit 7 spur which runs between the toll house of the Maine Turnpike and U. S. No. 1. The toll house is about two thirds of a mile from Foden's. He saw, about 200 feet away, a man crossing the spur at a "slow lope". The man was directly in front of the police cruiser and the officer put his lights on high beam. When he was 50 to 75 feet from the man, the man turned toward him and he observed that the man answered to the description which had been given him. He observed the clothes to be dark green with a ski parka which appeared blue and that the man had a revolver in his hand. He had the man in view for some thirty seconds and he saw the man's face for perhaps five seconds. He testified that he was the same man whom the officer later saw under arrest at 6 o'clock the same morning and who was the Defendant in the trial which we are now reviewing.

The officer stopped his cruiser, radioed for help, turned on his revolving blue light and started to chase the man on foot. The officer was in uniform and the cruiser carried identifying symbols. The officer observed the man about 100 feet away at the edge of the woods and shouted that he was a police officer and ordered the man to stop. The man ran into the woods out of the officer's sight and the officer followed him. He could hear something moving ahead of him "sloshing around in the wa-

ter". At this point three shots were fired from the direction where the man had disappeared and in the direction where the officer was. The officer returned the fire and after attempting for a short time to follow the man in the darkness, gave up the chase. He described the water standing in the woods as being about knee deep or deeper and the officer was very wet when he left the woods.

About 1 o'clock in Portland a Portland police officer began cruising the area of the Defendant's residence and observed that the porch light remained on as he passed the house six or eight times. At 3:45 A.M. he noticed the porch light had been extinguished. He then called for his Sergeant and the two officers knocked at the door and asked for Bruce Weeks. The lady who answered their knock invited them in and told them the Defendant was in the bedroom in the back of the house. The officers entered and found the Defendant in bed in a very small room, "just big enough for the bed and a dresser". They told the Defendant he was wanted by the South Portland Police Department and that he was under arrest. Defendant proceeded to dress in new work clothes which still bore the manufacturer's labels. As Defendant dressed the officers saw, by the side of the bed, green work pants of the same type and a suit of long underwear. The work pants and the underwear were wet from the bottom to the knees. The Defendant told the waiting officers that his shoes were in the hallway. The officers observed that these shoes were sitting by a hot air grate but that they were "soaked inside out".

At the police station record room at about 6 A.M. officer Vogler was asked to observe Defendant and Vogler identified him as being the man he had chased near the toll house.

Defendant did not testify and presented for defense a young friend who testified that he had picked Defendant up at his place of work at South Portland at 12:20 A.M. and had driven him to his home in

Portland leaving him there at 12:40. He fixed the date as being the day on which his mother had purchased for him a Ford Falcon. While this testimony, if true, would not completely exclude the possibility of Defendant's presence near the toll house at 1:00 A.M. it would make it appear very unlikely. However, a car salesman, called by the State, testified that the car had been purchased by the witness' mother more than a month before the day in question and had been returned to the dealer three days after being purchased.

The jury found Defendant guilty.

The Defendant's Statement of Points on Appeal presents three issues:

"1. The Court erred in not instructing the jury regarding the reading of the wrong indictment by the Deputy Clerk, although the Court indicated an intention to instruct the jury to disregard it at the time of defendant-appellant's motion for mistrial.

2. The search of the premises of the defendant-appellant without a warrant, incidental to his arrest, violated the Constitutional Right of defendant-appellant.

3. The weight of evidence was insufficient to convict defendant-appellant."

■ 1. After the jury had been empaneled, accepted and sworn for Defendant's trial, the Clerk of Courts inadvertently started to read an indictment which apparently charged the Defendant with the break in the Foden building. The Court interrupted the Clerk when the Clerk read the words "a building in which valuable things were then and there kept, of one E. G. Foden Company, Inc.", saying "You have the wrong file." The Clerk then proceeded to read the indictment charging the offense presently being considered. Defendant's attorney moved for a mistrial. The Presiding Justice stated that he didn't consider the partial reading to have been prejudicial. He added "I would instruct the jury to disregard anything that was

said previous to that time because he didn't finish reading it."

Trial proceeded. The fact that Defendant had been arrested on a charge of breaking into Foden's was disclosed to the jury by the alibi witness called by the Defendant. After completion of testimony and arguments, the Justice instructed the jury in general language as to the presumption of innocence, that an indictment is only the instrument which brings the Defendant before the Court and is not to be considered as evidence and that the Defendant in fact begins a trial with a clear slate with no evidence against him but he made no specific reference to the Clerk's partial reading of the wrong indictment. No request for such an instruction was made by Defendant's counsel. At the close of the instruction the Justice inquired of counsel if they wanted further instructions to be given and Defendant's attorney answered that he wished nothing further.

The question presented to us is whether the Justice was in error in not instructing the jury to disregard the partial reading of the Foden indictment.

In the first place, we view the Justice's statement to counsel not as a commitment to give a particular instruction to the jury but as an offer to give one if Defendant's counsel requested it. No such request was made, perhaps because of trial strategy. The testimony which had been produced in the meantime may have convinced Defendant and his counsel that Defendant's alibi defense might be more acceptable to the jury from a time standpoint if the jury had in mind that Defendant had also been charged with having participated in the Foden break at the time the witness said he was working in the filling station.

M.R.Crim.P., Rule 30 states:

"(b) *Instructions.* At the close of the evidence, or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time

copies of such requests shall be furnished to the adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party shall assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing and presence of the jury."

If Defendant chose for strategic reasons not to request the instruction he may not now take advantage of the fact that the Justice, on being told that no further instructions were wished by Defendant, gave none. State v. Smith, 140 Me. 255, 284, 37 A.2d 246, 258 (1944); State v. Boisvert, Me., 236 A.2d 419, 422 (1967); State v. Warner, Me., 237 A.2d 150, 158 (1968); Glassman, Maine Practice, 30.3, 30.4.

■ 2. Although neither the shoes, trousers nor the long underwear were offered as exhibits at trial the witness' testimony as to their wet condition must have contributed substantially to the jury's conclusion that his guilt was proved. This evidence was received without objection from Defendant and we have held that if the Defendant fails to make a timely objection at trial no point is preserved for consideration on appeal, unless the alleged error constitutes a denial of the fundamental rights of a fair trial. State v. Rowe, Me., 238 A.2d 217 (1968). We are not unmindful of Defendant's present argument that the failure of his counsel to seek to exclude this evidence is not necessarily a waiver of a constitutional right by the Defendant (Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837, 869 (1963); Glassman, supra, 35.8) but examination of the record reveals neither a search nor a seizure. There is no evidence that the officers made any search of Defendant's room or of the house. The legality of the arrest is not questioned. The trousers and long underwear lay beside Defendant's bed and were seen by the officer while he was arresting Defendant. The wet shoes stood in the hallway through which the men presumably passed in entering and leaving the small room. To observe that which is open to view is not a search. State v. MacKenzie, 161 Me. 123, 137, 210 A.2d 24 (1965); State v. Warner, Me., 237 A.2d 150, 161 (1967); State v. Poulin, Me., 268 A.2d 475 (1970); 47 Am.Jur., Searches and Seizures, § 20; 79 C.J.S. Searches and Seizures § 1. If the wet clothing and shoes were seized by the officer, the record does not disclose it.

■ 3. While the period during which the officer had Defendant under observation was brief—not more than thirty seconds—the circumstances under which the viewing took place were made clear to the jury. His observation of the Defendant crossing the highway in the lights of the police cruiser taken with the testimony concerning the wet condition of Defendant's clothing and shoes adequately supported the jury's conclusion that his guilt had been proved.

On appeal, Defendant attacks the manner under which Officer Vogler identified the Defendant at the South Portland Police Department, contending that it was unduly suggestive and that it tainted the testimony of identification given by Vogler at trial. Defendant does not contend that the specific requirements as to certain lineup identifications enunciated in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and in Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) control but rather that the identification at trial was fatally unreliable because of the officer's commitment to watch for a man of a certain description before the shooting when taken in conjunction with the circumstances under which he saw the Defendant at the Police Department.

We are mindful of the potential dangers of unfair suggestion that may occur when

the police present a suspect for observation by the victim and of the risk that the victim's courtroom identification may be based on the observation at the lineup and not on his view at the scene of the crime.

At trial, there was no objection to Vogler's identification of Defendant. The record discloses that the officer testified that he saw Defendant in the light of his cruiser for no more than thirty seconds. He made observation of Defendant's clothes and his gun during this time. He had a view of Defendant's face for about five seconds. Five hours later he was told by his Captain that "* * * [T]here was a man that they wanted to know if I had ever seen." He saw the Defendant sitting in the Records Room with several policemen. He said then that the Defendant was the man who shot at him. Less than two months later on cross-examination he insisted that he was sure of his identification and that it was based on his view of the man on the highway and especially his face and not on the fact that the height and weight of the Defendant approximated that of the man for whom he had originally been told to watch.

The circumstances under which the officer observed the Defendant were before the jury. The jury was presented with the duty of determining the degree of confidence to be placed in his identification from these circumstances and from the jury's own observation of the witness. The jury could also conclude that the Defendant had arrived home in the early morning wearing clothing the condition of which indicated that the wearer had recently been walking in deep water.

We cannot find from this record that the officer's identification stemmed from a procedure so unduly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

Appeal denied.