**STATE of Maine**

**v.**

**Gary A. DEVOE and Charles H. Ryder.**

Supreme Judicial Court of Maine.

March 15, 1973.

Joseph E. Brennan, County Atty., Portland, for plaintiff.

Childs, McKinley & Emerson, by Richard S. Emerson, Jr., Daniel G. Lilley, Stephen Sunnenblick, Portland, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, and ARCHIBALD, JJ.

ARCHIBALD, Justice.

This case is before us on separate appeals by each appellant.

Each appellant was separately indicted for two felonies, namely, robbery (17 M.R.S.A. § 3401) and assault of a high and aggravated nature (17 M.R.S.A. § 201). Since the facts underlying each indictment arose from the same transaction, all the indictments were consolidated for trial. The jury found each appellant not guilty of robbery, but convicted appellant Devoe of assault of a high and aggravated nature and appellant Ryder of simple assault.

We determine that there is no merit to either of the appeals, which were conjoined for purposes of argument, and both are denied.

Although several alleged errors were asserted in the points reserved for appellate review, we consider only those points which were pressed in argument, considering the remaining to have been waived. The issues before us, therefore, may be reduced to four, namely:

(1) The verdicts were inconsistent.

(2) The Court allowed prejudicial hearsay evidence to be admitted.

(3) The presiding Justice restricted cross-examination and improperly participated in the examination of witnesses.

(4) In distinguishing between aggravated and nonaggravated assault, the presiding Justice improperly invaded the prerogatives of the jury by an instruction that it "must" find the assault to be aggravated on proof of specified facts.

FACTS

The appellants were officers in the Portland Police Department but at the time of the incident neither was on duty. Appellant Devoe was friendly with a waitress who worked in a Portland restaurant. She had purchased a wristwatch from the victim of the assault, Ernest T. Peters, and had complained to Devoe that the watch was defective. It was then understood that when Peters was again in Portland she would so inform Devoe, who volunteered to assist her in recovering the purchase price.

On the evening in question, January 6, 1971, Peters entered this restaurant, was observed by the waitress, and she called Devoe at a local club. Ryder was also at this club and, at Devoe's request, accompanied him to the restaurant. On arrival the two off-duty officers met Peters on the sidewalk where an altercation ensued.

Peters' factual version of the episode was in violent contrast with that subsequently given by the appellants. Peters testified that Devoe approached him, demanded a refund of the purchase price of the watch, struck him, knocked him to the sidewalk where he was kicked and severely beaten by both appellants. He stated that "Devoe did all the talking." Ultimately the two officers not only forcibly took the purchase price of the watch but, additionally, took all of Peters' remaining money. He testified that during this process he was threatened by Devoe, whom he quoted as saying:

> '[i]f you don't shut up, we'll take you down to Commercial Street and lead you, put you in the river."

Following the assault the appellants forced him to enter the restaurant and the wristwatch was returned to him. He then left and, having been ordered by Devoe to leave the City of Portland, was taken by a friend to a hospital in New Hampshire where he was a patient for some six days.

Devoe described the episode in contrasting language, as did Ryder. It was their testimony that Peters approached Devoe in a state of anger, using profanity, and seized him by the lapels. This act prompted Devoe, reacting as a police officer, to "kick his feet out from under him," whereupon they fell to the sidewalk, Devoe landing on top of Peters. Ryders' only participation was merely to help Devoe back to his feet, whereupon they entered the restaurant. It was while in the restaurant that Peters voluntarily returned the purchase price of the watch to the waitress and then left. Both appellants denied having used any offensive violence against Peters, and they likewise denied taking any money from him.

*Point 1*

The appellants argue that the verdicts are inconsistent with each other, contending that the jury, on the facts, should have returned the same verdict against each appellant.[1]

1. If we were only considering the verdict rendered as to Ryder, and he took the position that his conviction of a lesser offense should be reversed because the

█ A careful study of the record does not fully support this argument on the facts. Peters' testimony clearly depicted Devoe as the initial aggressor, who also used strong language from which the jury could infer an intent on the part of Devoe to inflict serious bodily harm, or even death, upon Peters. Although Peters did testify that Ryder kicked him while he was prone on the sidewalk, the jury may have discounted the factual accuracy of this testimony because of confusion incident to the melee. Since the jury could find that Devoe was the aggressor and harbored personal motives of ill will against Peters, it could conclude that Devoe's participation in the assault was greater in degree than that of Ryder. In that respect the two verdicts are not necessarily inconsistent.

██ It is peculiarly the province of a jury to reconcile conflicting testimony, to determine its relative weight, and to determine what part of the testimony is credible and worthy of belief. State v. Merry, 136 Me. 243, 8 A.2d 143 (1939). Additionally, and assuming arguendo that the two verdicts are inconsistent, it is the modern view that criminal verdicts as between two or more defendants tried together need not demonstrate rational consistency. The United States Circuit Court of Appeals for the 5th Circuit succinctly states the rule in this language:

> "The rendering of inconsistent verdicts has always been an exclusive privilege and prerogative of the jury, and it is not our duty to unravel the ratiocinations of the jury's collective logic."

Odom v. United States, 377 F.2d 853, 857 (1967); *see also* Annot., 22 A.L.R.3d 717 § 3.

There is no merit to this contention.

*Point 2*

█ During the course of Peters' examination he testified that one result of the assault was a "fractured rib." This evidence was allowed to stand on the representation that the State would prove the fracture by medical testimony. Subsequently, Peters' attending physician did testify. The doctor described the general injuries suffered by Peters, including the diagnosis of a fractured rib. He had seen X-rays which were taken at the hospital but not under his supervision. *Assuming* that this testimony was based upon hearsay, it was rendered harmless in view of the following question by the Court and answer by the doctor:

> "THE COURT: . . . Doctor, based upon your own personal examination of Mr. Peters, and the evidence which you found as a result of that examination, can you tell us the injury sustained by him in the chest area?
>
> THE WITNESS: My examination revealed him to be very tender on pressure just under the breast area, and this would be consistent with a fractured rib."

The issue was whether the assault was of a high and aggravated nature, not whether Peters had a fractured rib. There was independent evidence of the physical results of the assault upon which the jury could base its finding of guilt.[2] Under these circumstances if there was error in allowing Peters' testimony to stand, it was, at most, harmless. State v. Wing, 294 A.2d 418 (Me.1972).

*Point 3*

█ During the course of the cross-examination of Peters he was asked to fur-

facts proved a higher degree of criminal conduct, we would reject such an argument consistent with our holding in State v. Heald, 292 A.2d 200 (Me.1972).

2. Dr. Lampesis described Peters' injuries as a cut on the head, "severe pain and tenderness just lateral to the breast," painful breathing, "inflamation in the lung area underneath the involved damaged chest region," a left testicle enlarged "one and a quarter its normal size," discoloration of the scrotum, "an abrasion over the medial aspect of the upper thigh just lateral to the scrotum," "discoloration just behind the tibia," and "right shoulder was very tender both anteriorally and posteriorally."

nish the address of a distributor with whom he had done business in the Portland area. In answering the question he refreshed his recollection by looking at a notebook. Counsel asked to inspect the book, Peters refusing in this language: "[T]hat's my own personal list of distributors, my personal notes." In our view the presiding Justice very properly refused the cross-examiner an opportunity to inspect these personal notes of the witness. There was no evidence that the contents of the notebook bore any relationship to the issues of the trial. Furthermore, the cross-examination dealt with a purely collateral matter. The ruling was within the discretion of the Justice presiding, and it has not been shown or even intimated that any prejudice resulted from this ruling. State v. Hume, 131 Me. 458, 164 A. 198 (1933).

On several occasions the Justice presiding asked questions of a witness or, after objection, reframed a question. Because the appellants have failed to show any prejudice, conjoined with their failure to comply with M.R.Crim.P., Rule 51, the appellants take nothing on this issue.[3] In any event, a careful reading of the record does not indicate that the presiding Justice ever assumed the posture of an advocate, nor did his limited examination of the witnesses give the slightest appearance of partiality. This point is completely without merit. State v. Haycock, 296 A.2d 489 (Me.1972).

*Point 4*

After the jurors had deliberated for nearly two hours they returned and asked for further instructions to assist them in distinguishing between "aggravated assault and simple assault."[4] The presiding Justice then reread Section 201 to the jury and redefined the general requirements of an assault. Prior to using the language to which there was specific objection, he explained to the jurors that it was their obligation to determine from the facts whether the assault was of a high and aggravated nature and suggested to them that they might reach this determination "from the circumstances or the conduct in carrying out the assault." He also stated

> "whether an assault shall be punished as of a high and aggravated character depends upon the proof, the conduct may constitute a misdemeanor or a felony. In other words, it's a question of whether or not the conduct, if you find that it existed was such as would classify it as a lesser offense, or a simple assault, or if it could be classified as an aggravated assault because of the intensity of the act itself."

The Justice pointed out that the jury could consider the intention to do bodily harm as an element in determining aggravation, saying "it's a question of what you believe." He then concluded the additional instructions by using this language:

> "I will instruct you that if you find as a fact beyond a reasonable doubt from the evidence that has been submitted to you in this case, that if Mr. Peters suffered the things that he said he suffered, the laceration of the head, the rib or chest injury, and the swelling of the testicle, or the discoloration of the scrotum, or the swelling of the scrotum, or the injury to the shin bone, and that these injuries were intentionally inflicted by either one or both of the respondents without legal justification—and when I refer to legal justification, I am talking about the element of self-defense that was interjected in the case—if you find that the defendant, or either of the de-

3. "Exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefore . . . ." M.R.Crim.P., Rule 51.

4. On at least nine occasions in the general charge the jurors were told that all factual decisions were theirs and this included the determination of whether or not the assault was aggravated.

fendants, or both of the defendants committed this assault and inflicted these injuries intentionally upon this complainant, then I instruct you, you *must* find that the assault was a high and aggravated assault." (Emphasis supplied.)

The appellants' argument seems to be bottomed upon the holding in State v. Ferris, 249 A.2d 523 (Me.1969), wherein it was held that the question of aggravation must be determined by the jury. It is argued that the use of the expression "must find that the assault was a high and aggravated assault," is directive and an invasion of the prerogatives of the jury.

We have repeatedly held that the correctness of the charge is to be determined from its entirety and not from isolated extracts. State v. Simpson, 276 A.2d 292, 294 (Me.1971).

What constitutes "aggravation" is neither self-explanatory nor capable of accurate definition in the abstract. The concept assumes substance and meaning to a jury only when related to facts and events. This and other courts have, of necessity, recognized certain sets of circumstances whereby what otherwise would be a simple assault is elevated to a higher grade, namely, aggravated assault, depending upon the proof. Rell v. State, 136 Me. 322, 9 A.2d 129 (1939).[5] In the present case it obviously was the judgment of the presiding Justice that the numerous injuries allegedly inflicted upon the victim, if found beyond a reasonable doubt to have been intentionally inflicted without legal justification, were sufficiently aggravating to sustain a finding by the jury "that the assault was a high and aggravated assault."

Although dealing with degrees of homicide, the following language found in Straughter v. State, 247 A.2d 202, 203–204 (Del.1968), is appropriate:

"The first contention is without merit. The argument advanced is that the use of the word 'must' had the effect of depriving the jury of its function of determining the degree of the homicide. It is, of course, the duty of the trial Judge to explain the applicable law, not to resolve the factual issues. It is clear to us, however, that the charge as a whole did not trespass upon the jury's function. It fully explained the elements of second-degree murder and manslaughter; it set forth in detail the various possible verdicts and the nature of the findings which would support them; it clearly left to the jury the determination of innocence or guilt, as well as the degree of guilt. The questioned paragraph does not direct a verdict of second-degree murder; to paraphrase it states that, if the jury finds the existence of those elements that make up the crime of second-degree murder, it is their duty to return such a verdict. If citation of authority be needed, we refer to the long list of cases cited in 23A C.J.S. Criminal Law § 1155 p. 420."

While more precise usage might suggest another expression such as "it would be your duty to find," as opposed to "you must find," the language objected to when heard by the jury in the context of the entire charge could not be understood as an absolute directive. The instruction properly pointed out to the jurors that, on proof beyond a reasonable doubt of the specified facts, a faithful adherence to their respective oaths made it their duty to reach the conclusion indicated. There was no error.

The entry is:

Appeals denied.

POMEROY and WERNICK, JJ., did not sit.

All Justices concurring.

5. For other Maine cases where, on the proof, a finding of aggravation was sustained, see State v. Bey, 161 Me. 23, 206 A.2d 413 (1965); State v. Tyler, 219 A.2d 754 (Me.1966); State v. Weeks, 270 A.2d 366 (Me.1970).