STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
GREGORY RAGLAND, DEFENDANT-APPELLANT.

Argued February 19, 1986—Decided November 21, 1986.

190

*Matthew Astore,* Assistant Deputy Public Defender, argued the cause for appellant (*Thomas S. Smith, Jr.,* Acting Public Defender, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards, Jr.,* Attorney General of New Jersey, attorney).

*Gary H. Schlyen,* Senior Assistant Prosecutor, submitted a letter brief on behalf of *amicus curiae,* County Prosecutors

Association (*Joseph A. Falcone*, Passaic County Prosecutor, President, attorney).

The opinion of the Court was delivered by

WILENTZ, Chief Justice.

In this matter we reconsider, pursuant to the State's motion, our decision reversing the judgment of the Appellate Division and remanding the matter to the trial court for a new trial, *State v. Ragland*, 101 *N.J.* 33 (1985). Reconsideration has not persuaded us to change that decision.

Defendant, Gregory Ragland, was convicted by a jury of conspiracy to commit armed robbery, unlawful possession of a weapon, and unlawful possession of a weapon without a permit. Another charge against him, possession of a weapon by a convicted felon (*N.J.S.A.* 2C:39-7), was severed on defense counsel's motion in order to avoid the inevitable prejudice in the trial of the other charges that would be caused by introducing defendant's prior felony conviction, an essential element in the severed charge. The prior conviction was not admissible to impeach defendant's credibility, since he did not testify.

After the jury's guilty verdict, the severed charge was tried before the same jury. That jury had just convicted defendant of charges that necessarily included a finding that defendant was in "possession of a weapon." The severed charge, as noted above, was possession of a weapon by a convicted felon. Included in the trial court's instructions on the severed charge was the following:

> If you find that the defendant, Gregory Ragland, was previously convicted for the crime of robbery and that he was in possession of a sawed-off shotgun, *as you have indicated* ... then you must find him guilty as charged by this Court.
>
> If, on the other hand, you have any reasonable doubt concerning any essential element of this crime, then you will find him not guilty. [Emphasis supplied.]

Defendant appealed, claiming that the foregoing portion of the instruction, in particular the emphasized part, deprived him of his right to a fair trial by jury since it amounted to an

instruction to the jury *not* to consider independently the question of possession but rather to abide by its prior determination of that fact. Defendant's claim was that in effect the court was charging collateral estoppel on that issue. The Appellate Division affirmed, 198 *N.J.Super.* 330 (1985), holding that the jury was free to make a new independent finding on the possession issue. We reversed and remanded the matter to the Appellate Division for reconsideration in light of *State v. Collier*, 90 *N.J.* 117 (1982), and *State v. Ingram*, 98 *N.J.* 489 (1985). 101 *N.J.* 251 (1985). On remand the Appellate Division again affirmed, holding that the jury instruction did not amount to a directed verdict on the possession element of the charge. 203 *N.J.Super.* 192 (1985). We again reversed, finding "that the unavoidable effect of the charge was to direct a guilty verdict" on the severed count, and remanded the matter for a new trial. 101 *N.J.* 33 (1985). It is this last mentioned decision that we now reconsider, on the State's motion.

## I.

This case presents the unique problem that arises when a defendant is charged at the same time with unlawful possession of a weapon and possession of a weapon by a convicted felon. The two charges must be tried separately since proof that defendant was a convicted felon (required in the trial of the latter charge) clearly tends to prejudice the jury in considering the former. If defendant is convicted of unlawful possession of the weapon, the trial of the latter charge (possession by a convicted felon), unless most carefully handled, can amount to a prohibited directed verdict in a criminal case. This, because the jury has already found by its initial conviction that the defendant possessed a weapon. If that same jury is told, in the immediately following trial of the charge of possession by a convicted felon, that it need not concern itself with the question of possession since it has already found that fact by its prior conviction, the defendant is, in effect, deprived of that trial by jury to which he is entitled, namely, one in which the jury must

find that the State has proved each and every material element of the crime beyond a reasonable doubt. *See, e.g., State v. Grunow*, 102 *N.J.* 133, 145 n. 5 (1986); *State v. Toscano*, 74 *N.J.* 421, 442–43 (1977). Absent careful instructions, the jury will have been told, in effect, that it need *not* find possession beyond a reasonable doubt because it has already found it in the prior trial.

Such a case, where conviction of unlawful possession is then followed, using the same jury, by a trial for possession by a convicted felon, is a charade in the absence of carefully limiting charges. Introduction of, or reference to, the same jury's unlawful possession conviction, coupled with admission of the prior felony conviction, leads to an almost guaranteed conviction of the crime of possession by a convicted felon. That such a conviction is clearly warranted is beside the point: the problem here is assuring that the defendant is given a fair trial.

The charges are severed for the protection of the defendant. Severance is customary and presumably automatic where it is requested because of the clear tendency of the proof of the felony conviction to prejudice trial of the separate charge of unlawful possession of a weapon. In *State v. Ingenito*, 87 *N.J.* 204 (1981), a different jury tried the second charge (possession by a convicted felon). It was given evidence of the prior jury's conviction of unlawful possession in such a manner, we found, as to amount to a direction that it must find possession. We deemed it the equivalent of collateral estoppel in a criminal case and found it improper. *Id.* at 213–17. We held that the second jury must clearly be instructed that it remains the State's burden to prove beyond a reasonable doubt, regardless of the prior conviction, that defendant possessed a weapon and, again beyond a reasonable doubt, that at that time he was a convicted felon. It was not enough to produce the prior conviction of unlawful possession; indeed, it was improper to do so.

Noting the waste that results when the issue of possession must again be proved before a new jury, we referred to the

possibility of the same jury trying both counts sequentially, as suggested at that time by the Attorney General. *Id.* at 217 n. 6. That is what happened here. The same jury first found the defendant guilty of unlawful possession and thereafter, at a "new" trial, guilty of possession by a convicted felon. Obviously this same jury, having found possession beyond a reasonable doubt in the first trial, is strongly inclined to find it once again an hour later when the "new" trial starts on the charge of possession by a convicted felon. It becomes essential, therefore, that the jury be instructed in no uncertain terms to consider anew the evidence previously admitted but to disregard completely its prior verdict. That there is a certain make-believe quality in such an instruction must be conceded since it is most unlikely that the jury will indeed forget its prior verdict. Nevertheless, the defendant is entitled to that instruction for on the "new" trial, the defendant is entitled to the presumption of innocence and, as a consequence of that, to an instruction that each and every material fact that makes up the crime, including obviously the fact of possession, must be proven by the State beyond a reasonable doubt.

There is a cost, therefore, to this efficiency, for there is the possibility that the jury will *not* independently review the facts again on the issue of possession, since it has only recently found that to be a fact. That cost, however, seems preferable to the cost of trying the two charges together, with the wholly impermissible prejudice that the felony conviction can cause, or trying the two charges independently with two different juries, with the waste of everyone's time involved in re-introducing evidence that has already been admitted.

What is needed in such a matter is a strong instruction to the jury to disregard its prior verdict of possession (for nothing short of that will suffice—unless defendant affirmatively requests that such charge *not* be given), advising the jury that it is the State's burden to prove that fact beyond a reasonable doubt, allowing the jury, however, to consider the

evidence that had previously been brought before it on the possession charge. In this case not only was no such charge given, but the judge affirmatively reminded the jury that it had already found that the defendant possessed the weapon ("if you find that the defendant ... was in possession of a sawed-off shotgun, *as you have indicated* . . ." (emphasis supplied)). Such a charge is manifestly improper, and no amount of reminder to the jury that it remains the State's burden to prove each element beyond a reasonable doubt will cure it. We need not determine whether this error was harmless beyond a reasonable doubt, for when the constitutional deprivation consists of a directed verdict, preservation of the integrity of the right to trial by jury requires reversal. *Cf. State v. Collier, supra,* 90 *N.J.* at 123 (directed verdict, affirmative finding that error was harmful).

For that reason we remanded the case to the Appellate Division, citing *Collier* and *Ingram,* and for that reason we again reversed, after the Appellate Division again affirmed the conviction, remanding to the trial court for a new trial, which ruling we now decline to disturb on reconsideration.

We referred to *Collier* in our reversals because in that case there was an explicit direction of a verdict of guilty. We referred to *Ingram* since it was another instance where the risk of a result similar to a directed verdict required a clear charge concerning the State's burden of proving each element of the crime (statutory presumption of no weapons permit does not release State of burden of proof). We were also disturbed by the use of the word "must" in this context, when, immediately after advising the jury that it had "indicated" possession by its prior verdict, the trial judge said "then you *must* find him guilty as charged by this court." Since our opinion (101 *N.J.* 33) was followed by our request to our Committee on Model Criminal Jury Charges to conform those charges to that opinion, our opinion in the case was generally understood as prohibiting instructions in

*any* criminal case that "you *must* find him guilty as charged by this court." It was this reading of our opinion that caused the Attorney General (supported by the County Prosecutors Association) to request reconsideration, and it was this issue that was practically the exclusive subject of briefing and oral argument on the reconsideration motion. It is noteworthy that up until that time, defendant had never contended that the use of such language was improper. That is not surprising, for such language is often found in criminal charges in this state, and as far as we know, has always been found acceptable. *See, e.g., State v. Grunow, supra,* 102 *N.J.* at 145 (quoting model jury charge using clause "then you must find the defendant guilty of manslaughter"); *State v. Headley,* 113 *N.J.L.* 335, 337 (Sup.Ct.1934) (quoting with approval jury charge including clause "then you must find the defendants guilty as charged"); *State v. Agnesi,* 92 *N.J.L.* 638, 639–40 (E. & A.1919) (Walker, Chancellor, concurring) (approving charge instructing jury that *"they could not under any circumstances acquit [defendant], but must find him guilty of manslaughter at least"* (emphasis in original)). What *was* surprising was this Court's apparent intent to prohibit such language in the future.

■ We have considered this new issue and conclude that use of the word "must" is not erroneous in this charge and in other jury charges. The question has not often been clearly litigated. Nonetheless, federal and state courts have held, albeit sometimes in dicta, that the use of "must" in a jury charge is appropriate. *See, e.g., Killian v. United States,* 368 *U.S.* 231, 82 *S.Ct.* 302, 7 *L.Ed.*2d 256 (1961) (noting instruction to jury that if it found "that the Government has sustained [its] burden ... beyond a reasonable doubt ... then you must find the defendant guilty"); *Sparf v. United States,* 156 *U.S.* 51, 15 *S.Ct.* 273, 39 *L.Ed.* 343 (1894) (quoting with approval instruction to jury that "if you believe the evidence in the whole case, you must find the defendant guilty"); *United States v. Cunningham,* 423 *F.*2d 1269 (4th Cir.1970) (holding that instructing a jury "you must find the defendant guilty" was not reversible

error in light of the totality of the jury charge); *Watts v. United States,* 362 *A.*2d 706 (D.C.Ct.App.1975) (holding that "must find defendant guilty" did not improperly direct a verdict); *Baker v. United States,* 324 *A.*2d 194, 199–200 (D.C.Ct. App.1974) (Harris, J., concurring) ("must find defendant" guilty, held not to improperly direct a verdict); *State v. Devoe,* 301 *A.*2d 541 (Me.1973) (instruction that jury *"must* find that the assault was a high and aggravated assault," did not deprive jury of its·function of determining the degree of the homicide (emphasis in original)); *Straughter v. State,* 247 *A.*2d 202 (Del.1968) (instruction to jury that it "must" return verdict of murder in second degree did not impinge on jury's function to determine gravity of the offense). *But see United States v. Hayward,* 420 *F.*2d 142 (D.C.Cir.1969) (holding that instruction that jury, if convinced beyond a reasonable doubt, "must find the defendant guilty" was improper even if it was "an honest oversight" by court; such instruction impinged on jury's function); *Billeci v. United States,* 184 *F.*2d 394 (D.C.Cir.1950) (holding *inter alia* that use of "must find the defendant guilty" was improper; proper instruction required "should"); *People v. Gillespie,* 54 *Mich.App.* 419, 221 *N.W.*2d 246 (1974) (holding that instructing a jury that under Michigan law "you must find ... the defendant ... [guilty] ... you have no discretion to reach a contrary decision" was reversible error).[1]

---

[1] The dissent's reference at 222, to *United States v. Dougherty,* 473 *F.*2d 1113 (D.C.Cir.1972), suggests that the court in that case had somehow disapproved of the use of the word "must." When that court noted that "[t]he jury were not told they must bring in a guilty verdict," 473 *F.*2d at 1138, all it meant was that there had been no *directed* verdict of guilty. The quotation continues "nor was there the kind of language or conduct, going beyond a declaration of the applicable law, that has in other cases been held coercive, and an improper departure from the role of the judge." *Id.* The "coercive" language referred to had nothing whatsoever to do with the use of the word "must" in a charge. The examples, summarized by the court, of coercive language from other cases make this abundantly clear: "court advocated defendant's guilt to the jury in a long address"; "judge expressed opinion that defendant was a liar"; "judge stated government's case as affirmative facts"; "judge stated matter in issue as

What emerges from this authority is that the United States Constitution does not appear to invalidate such a charge;[2] that state authority is divided—although, on balance, sustaining its propriety; and that New Jersey has never clearly decided the issue. We therefore examine what rule best serves the interests involved in the right to trial by jury.[3]

## II.

It is conceded that the "must" charge is widely used in New Jersey and has been as long as anyone can remember. Defendant refers to the instructions as "commonly used in this jurisdiction" and acknowledges that the "must" charge is found in our model jury charges—frequently, we might add. Defendant calls it "our current system of instructing jurors." We agree. While our review, for this purpose, of jury charges in criminal matters recently before us, as well as our recollection, indicates a great variety in the language used to instruct a jury concern-

---

a fact, and in other respects advocated the prosecution's position." *Id.* at 1138 n. 55 (citations omitted).

[2]Only *United States v. Hayward,* 420 F.2d 142 (D.C.Cir.1969), intimates that the use of "must," alone, violates a defendant's Sixth Amendment right to a trial by jury. *Id.* at 144. As noted in the text, other federal courts have explicitly allowed the language since *Hayward,* (*see, e.g., United States v. Cunningham,* 423 F.2d 1269 (4th Cir.1970)), and a host of state and federal courts have sanctioned the practice for generations. In light of this overwhelming evidence to the contrary, we do not give much weight to the isolated precedent of *Hayward,* and we refuse to find a jury charge containing the word "must" to be categorically unconstitutional.

[3]We decline to search New Jersey's judicial history to determine whether the "must convict" charge was either so clearly established or so clearly rejected as to warrant a conclusion that the reception of common law determines the issue, or that the history post-reception somehow determines the issue. Counsel have neither briefed nor argued this history. Furthermore, no state constitutional argument has been asserted. Absent such contentions, we choose to decide the issue in this case as a matter of state common law based on those considerations of public policy clearly recognized in the administration of criminal justice, and in particular in connection with the right to trial by jury.

ing its responsibilities, the "must find him guilty" format is there in abundance. And so are many other formulations.[4]

The defendant would require a charge that states, in effect, that if the jury does not find a, b and c beyond a reasonable doubt, it must find defendant not guilty, but that if it does find a, b and c beyond a reasonable doubt, then it may find defendant guilty.[5] In support of this change in present practice, defendant contends that the jury's power of nullification—the unquestioned power of the jury to acquit with finality no matter how overwhelming the proof of guilt—is an essential attribute of a defendant's right to trial by jury; that use of the word "must" conflicts with that attribute, for it incorrectly advises the jury that if it finds the proof of guilt beyond a reasonable doubt it *must* convict, whereas the truth is that it need not do so, it may, in fact, acquit; that "must" convict, therefore, should never be used. While noting that the word "should" "is

---

[4]To summarize what we found in this review of recent charges, we shall refer to the "standard" charge as taking the form "if you find a, b and c beyond a reasonable doubt then you ——— find the defendant guilty; but if you do not find a, b and c beyond a reasonable doubt, then you ——— find defendant innocent." The most common forms of this standard charge use either must-must (in other words "must find defendant guilty" and "must find defendant innocent") or should-should. There is also a liberal sprinkling of will-will, and a whole combination of mixes (should-must, must-should, shall-shall, will-would, would-will, etc.). The phraseology "it would be your duty" is also sometimes used, as is "entitled to be acquitted." These different forms are sometimes found in the same case. In the cases we reviewed, some judges never used "must," some used "must" and "will," and aligned them with "must" and "will" on the innocent side, some mixed it up with "should" for guilty and "must" for innocent and then "must" for guilty and "should" for innocent. The combinations and permutations are obviously numerous. What is important here is not only the variety in present practice, but the common use of the word "must" in connection with the guilty portion of the charge.

[5]Defendant also contends that an explicit charge on nullification should be delivered: "However remember that you are here as representatives of your community. Accordingly you are entitled to act upon your conscientious feeling about what is a fair result in this case and acquit the defendant, even if the State has proven its case, if you believe that justice requires such a result." We will treat this request later in this opinion.

better than 'must,' " defendant would also prohibit the use of that word in connection with the guilty charge since when the court says it "should" convict, the jury will believe that the court means it "must."

While defendant's arguments suggest that the ultimate object is to assure that the jury is not impeded by this coercive language from performing its proper role, the effect of the change is somewhat different. Its only effect, its only tendency, is to make it more likely that juries will nullify the law, more likely, in other words, that no matter how overwhelming the proof of guilt, no matter how convinced the jury is beyond any reasonable doubt of defendant's guilt, despite the law, it will acquit. Even without an explicit charge on the power of nullification, the jury must understand from this contrasting language (*must* acquit but *may* convict) that it is quite properly free, and quite legally free (since it is the court who is telling it "may") to acquit even if it is convinced beyond a reasonable doubt of defendant's guilt. Whether the contrast is as clear as "must" and "may," or is expressed in some other way (*e.g.*, "you are authorized to find the defendant guilty," "a guilty verdict would be considered valid or proper," "you have the responsibility to return a guilty verdict," "the State is entitled to the return of a guilty verdict"—all contrasting with "you must acquit"), the message, intended by the charge and so understood by the jury, is that you have the power to nullify and it is permissible for you to do so.

This change in our settled practice, this attempt to modify our present instructions to the jury in order to allow for the uninhibited, robust, exercise of its nullification power, is not commanded by the United States Constitution, the New Jersey Constitution, any statute, or by the common law. The implication of defendant's argument is that the use of the word "must" in this connection violates both his federal and state constitutional rights, since the protected right—nullification—is described in terms of an essential attribute of defendant's right to trial by jury. We have been able to find but one federal case

that supports the defendant's argument, *United States v. Hayward*, 420 *F.*2d 142 (D.C.Cir.1969). This seventeen-year-old case has not been followed in other federal courts on this proposition. The overwhelming weight of authority is to the contrary, namely, even in those cases where the use of the word "must" is discouraged, it is not as a result of a constitutional command. While constitutional rights do not atrophy through lack of use, the fact that it has taken more than two hundred years, in New Jersey at least, to make this constitutional assertion suggests its lack of constitutional basis.

There is no statute that requires this change. As for the common law, all that the New Jersey cases require is that there be no directed verdict in a criminal case. The use of the word "must," of course, is not the same as a directed verdict. It is not even its functional equivalent. A directed verdict results when the court instructs the jury to find the defendant guilty of a particular charge, as the trial court did in *State v. Collier, supra,* 90 *N.J.* 117. There the court "direct[ed the jury] to find the defendant guilty of contributing ..." to the delinquency of a minor. After noting that "no matter how compelling the evidence, a trial court may not direct a verdict against a defendant in a criminal case," *id.* at 122, and that "in addition 'appropriate and proper charges to a jury are essential for a fair trial,'" we said:

> At the heart of the guarantee of a fair trial is the "jury's impartial deliberations upon the guilt of a criminal defendant *based solely upon the evidence* in accordance with proper and adequate instructions ...."
>
> [90 *N.J.* at 122, quoting from *State v. Simon,* 79 *N.J.* 191, 206 (1979) (emphasis supplied).]

The harm of the directed verdict in that case, as in any criminal case, is that it deprived the jury of the power to determine guilt; there is no suggestion or hint in the case that once having determined guilt, the jury's power thereafter to nullify its own determination is entitled to similar protection.

In *State v. Ingenito, supra,* 87 *N.J.* 204, we held that the evidentiary use of a prior conviction by another jury of the

crime of unlawful possession amounted to a "collateral estoppel" on the possession issue in the trial of the charge of possession by a convicted felon. The prior jury's verdict and conviction, being the only proof of possession (the underlying proofs that led to that conviction were not introduced), the jury had effectively been stripped of its fact-finding role. We held that this was the functional equivalent of a directed verdict. We noted that in addition to its fact-finding function, "the jury in the trial of a criminal case is responsible also for finding the truth. This entails not only the determination of basic facts but also the ultimate question of guilt or innocence." *Id.* at 211. We recalled the fact that the jury "has the prerogative of returning a verdict of innocence in the face of overwhelming evidence of guilt." But mixed in with those observations we asserted that the "duties inherent in the jury function include ... deciding the ultimate guilt or innocence of a defendant *in light of the underlying evidence." Id.* at 212 (emphasis supplied). We had previously stated in that case that "in the discharge of these fundamental responsibilities, the jury must consider *solely* the evidence adduced in the case before it." *Id.* at 211, citing *Taylor v. Kentucky,* 436 *U.S.* 478, 485, 98 *S.Ct.* 1930, 1934, 56 *L.Ed.*2d 468, 475 (1978) (emphasis supplied). *Ingenito* is but another case where the jury's function of determining the facts and the application of the law to those facts was denied it by virtue of reference to another jury's determination; we emphasized the requirement that the jury consider solely the evidence before it (as distinguished from its own notion of what is right and wrong) and decide the case accordingly.

*State v. Simon,* 79 *N.J.* 191 (1979), is sometimes cited in support of the right of a jury to determine innocence despite overwhelming proof to the contrary. In that case certain special questions were submitted to the jury before it was given the responsibility of determining guilt or innocence. The Court found that those questions subliminally suggested guilt, that they conditioned the jury to think in terms of guilt. The

strength of the tendency of pressuring the jury to find guilt was suggested by the quotation the Court used from *United States v. Bosch*, 505 *F*.2d 78, 78–79 (5th Cir.1974): "The special interrogatories which were used to narrow the issues for the jury may have required them to return a verdict of guilty *even though they found that all elements of the offense had not been proved.*" (Emphasis supplied.) Later references in that case to the jury's right "as the conscience of the community ... to look at more than logic," *State v. Simon, supra,* 79 *N.J.* at 208, or its right to return a verdict of not guilty even if the proofs "show unmistakably that an accused had committed an offense" are appropriate observations in the context of a case where the jury had been "convert[ed] to belief in guilt." *Id.* at 207. *State v. Simon* is no advocate for nullification. Its concern is "with the court's duty to assure that the jury is able properly to discharge its most important responsibility in a criminal trial, determining guilt or innocence." *Id.* at 206. What is the court's responsibility in this connection? *State v. Simon* answers: "This judicial obligation, to assure the jury's impartial deliberations upon the guilt of a criminal defendant based *solely* upon the evidence in accordance with proper and adequate instructions, is at the core of the guarantee of a fair trial." *Id.* at 206 (emphasis supplied).

There is no common law in New Jersey to the contrary, either in recent or ancient cases. The concern, in New Jersey as elsewhere, is to rigorously protect the jury's independence in determining the facts and applying those facts to the law; based solely on those findings, the jury determines guilt or innocence; no case in New Jersey purports to protect the jury's "right" to announce a verdict of acquittal despite its determination of guilt, although many recognize the power.

### III.

We conclude that the power of the jury to acquit despite not only overwhelming proof of guilt but despite the jury's

belief, beyond a reasonable doubt, in guilt, is not one of the precious attributes of the right to trial by jury. It is nothing more than a power. By virtue of the finality of a verdict of acquittal, the jury simply has the *power* to nullify the law by acquitting those believed by the jury to be guilty. We believe that the exercise of that power, while unavoidable, is undesirable and that judicial attempts to strengthen the power of nullification are not only contrary to settled practice in this state, but unwise both as a matter of governmental policy and as a matter of sound administration of criminal justice.

It is only relatively recently that some scholars have characterized this power as part of defendant's right to trial by jury and have defended it as sound policy. *See, e.g.,* Scheflin, *Jury Nullification: The Right to Say No,* 45 S.Cal.L.Rev. 168 (1972); Kaufman, *The Right of Self-Representation and the Power of Jury Nullification,* 28 Case W.Res. 269 (1978). Like defendant, they take the position that the exercise of the power is essential to preserve the jury's role as the "conscience of the community."

There are various elements in this view of the jury as the "conscience of the community." Some laws are said to be unfair. Only the jury, it is thought, is capable of correcting that unfairness—through its nullification power. Other laws, necessarily general, have the capacity of doing injustice in specific applications. Again, only the jury can evaluate these specific applications and thereby prevent injustice through its nullification power. Cast aside is our basic belief that only our elected representatives may determine what is a crime and what is not, and only they may revise that law if it is found to be unfair or imprecise; only they and not twelve people whose names are picked at random from the box.

Finally, there is an almost mystical element to this contention about the "conscience of the community": before anyone is imprisoned, that person is entitled to *more* than a fair trial even when such a trial is pursuant to a fair law. He is entitled to

the benefit of the wisdom and compassion of his peers, entitled to the right to have them conclude that he is guilty beyond any doubt, but that he shall be acquitted and go free because of some irrational, inarticulable instinct, some belief, some observation, some value, or some other notion of that jury.

If the argument is that jury nullification has proven to serve society well, that proof has been kept a deep secret. It is no answer to point to the occasions when laws that are deemed unjust have, in effect, been nullified by the jury. That proves only that the power may have done justice in those limited instances, without reflecting on whether, even in those instances, the cost of that justice exceeded its benefit, or whether in other instances it has done more harm, on balance, than the good. We know so little about this power that it is impossible to evaluate it in terms of results.

Since there is neither constitutional nor other legal authority mandating the proposed change in jury instructions, its ultimate justification must be that this new formulation of the proper charge is desirable; desirable that a jury should *not* be compelled to follow the law, for compulsion to follow the law is the natural tendency of the use of the word "must"; desirable that a jury should be left free to ignore the law, for that is the obvious tendency of telling the jury simply that it "may," or is "authorized" to, bring in a verdict of guilty, after saying it "must" find defendant not guilty. If indeed this is a desirable state of affairs, then the jury should be told of its power, so as to leave no doubt that the jury *knows* it is not compelled to bring back a guilty verdict despite its finding beyond a reasonable doubt that the defendant has committed the crime. The point here is different from that of those who say they are not sure whether the nullification power is desirable or undesirable, but since it exists, the jury should be told about it—an argument discussed later in this opinion. See *infra* at 208. Defendant's position is that the nullification power is one of the essential attributes of his right to trial by jury, and that it is

desirable. Given that premise, the conclusion is inescapable—the jury should be told.

Other consequences should follow a conclusion that the nullification power is desirable. Counsel should be told that they may address that point in summation,[6] that defense counsel should be allowed to argue to the jury that it should *not* apply the law given by the court, but rather should follow its own conscience, along with whatever argument counsel deems persuasive, and the prosecutor similarly should address these otherwise irrelevant issues, presumably including an encomium on law and order. If the court makes introductory remarks to give the jury some idea of its role (as is customary), it should add to the usual explanation—that the jury is the finder of the facts and the judge is the finder of the law—the qualification that ultimately, regardless of the facts and regardless of the law, the jury, and only the jury, will determine guilt or innocence. On voir dire, potential jurors, in addition to being asked whether they believe they will be able to obey the court's charge, should also be asked if they believe they will be able to ignore the court's charge. If the nullification power is desirable, then, obviously, juries should include only those people who are capable of exercising it.[7]

---

[6]After our prior decision, 101 *N.J.* 33, it was reported that such a contention was made by counsel in a criminal trial in *Union County.* "Consider Patrolman's Reputation, Jury Told," The Daily Journal (Elizabeth), Apr. 25, 1986, at 7.

[7]Our review of recent jury instructions in criminal cases shows that the trial court invariably instructs the jury that it, and not the judge, is the final arbiter of the facts but that the judge determines the law, and that the jury is controlled by that law and *must* follow it. Defendant claims that this settled charge is also impermissible. A typical charge follows:

At this point in the trial of the case the function of the court is to instruct the jury with respect to the principles of law that govern the case and the jury is required to accept and be controlled by the law as stated by the court. On the other hand, you are the sole judges of the facts. You must consider, weigh and evaluate the evidence, determine the credibility of the witnesses, draw inferences from the testimony and thus establish the facts.

If we are correct, that is, if such a change in the charge given to the jury is not compelled either by constitution, by statute, or by common law, then the question boils down to one of policy and the power of this Court. In deciding that question, it is essential to recognize precisely what we are talking about. There is no mystery about the power of nullification. It is the power to act against the law, against the Legislature and the Governor who made the law. In its immediate application, it transforms the jury, the body thought to provide the ultimate assurance of fairness, into the only element of the system that is permissibly arbitrary. And in its immediate application, it would confuse any conscientious citizen serving on a jury by advising that person, after the meticulous definition of the elements of the crime, the careful description of the burden of proof, and the importance of the conscientious discharge of that person's duties, that, after all is said and done, he can do whatever he pleases. Spectators, formerly amazed at verdicts that clearly violated the law (namely, verdicts that suggested that the jury had nullified the law), will be comforted to know that there is nothing to be amazed about, that juries are not required to follow the law, that they are advised that one of their important functions is *not* to follow the law, and that this advice is given by the ultimate symbol of lawfulness, the judge. It is difficult to imagine a system more likely to lead to cynicism.

There is another point of view that accepts the existence of the power as a fact, regardless of its desirability, and concludes that if we cannot eliminate it, we should at least make its application equal by making sure every jury knows of it. There is a surface appeal to the equality advocated. If one believes, however, that the exercise of the power is essentially arbitrary,

---

You must then apply the law as given to you by the court to the facts as you determine the facts to be and thus reach your verdict. [Excerpt from charge in *State v. Federico*, I–0372–03–83, (Law Div.1983) (Davidson, J.S. C.).]

the position that every jury should be advised of this power is seen as leading not to more equality but to more arbitrary results. That is not the sole reason for opposing such a position, however. What may be more important than minimizing these arbitrary results is the question of society's determination to make the jury system work as rationally as possible. The cynicism and disbelief that are encouraged by such instructions to a jury, including, especially, the instruction that tells the jury it need not listen to instructions, are more to be avoided than even the arbitrariness likely to affect the jury's final determination.

The fundamental defect in jury nullification is obvious. It is a power that is absolutely inconsistent with the most important value of Western democracy, that we should live under a government of laws and not of men. There are many manifestations of the concept of a "government of laws," and one of the most important is its operation in the administration of criminal justice. It is there that the sovereign is visibly restrained, it is there that we can see most clearly the application of this hard-earned rule, the rule that no one, to the extent man is capable of achieving this goal, no one, shall be found to have violated society's commands unless that command is first announced and then only after a group of free people, hearing all of the evidence, determine that the accused has violated the command. With jury nullification, these free people are told, either explicitly or implicitly, that *they* are the law, that what the sovereign has pronounced ahead of time either may or may not be followed, and that if they want to, they may convict every poor man and acquit every rich man; convict the political opponent but free the crony; put the long-haired in jail but the crew-cut on the street; imprison the black and free the white; or, even more arbitrarily, just do what they please whenever they please.

One of the biggest problems in the administration of criminal justice is the inequality of its enforcement, an inequality that starts with the inability to find all of its violators (it is some-

times estimated that only one out of ten violators is apprehended) and then apply the law equally to those who are caught. The extent to which the inequality at that point varies depends upon prosecutorial discretion, the differences in the abilities of counsel, and the varying strength and wisdom of judges. But at every stage of the proceeding, from the work of the police and the prosecutor's office, to the actions of a grand jury and the work of the judiciary at trial, all elements strive, at least consciously, for one goal, and that is the equal application of the law to all accused, so that all who are guilty are found guilty and all who are innocent are acquitted. Absolutely nowhere in the system is there some notion that someone should have the power, arbitrarily, to pick and choose who shall live and who shall die. But that is precisely what jury nullification is: the power to undo everything that is precious in our system of criminal justice, the power to act arbitrarily to convict one and acquit another where there is absolutely no apparent difference between the two. It is a power, unfortunately, that is there, that this Court cannot terminate, but a power that should be restricted as much as possible. The defendant would enshrine that power, in effect pronounce it one of the precious rights of a defendant, and thereby weaken our system of criminal justice and our dedication to fairness in prosecuting criminals.

The underlying fault of nullification is its total arbitrariness. No one knows what causes it or whether what causes it in one instance causes it in another. No one knows what factors are at play. No one tells a jury what the standards are that should be considered in exercising jury nullification, and no jury advises what standards it applied, or that it applied any. The very nature of the power is that it is absolute, unguided, not to be explained. There is no quality that it lacks if the goal is arbitrariness; it is totally and perfectly arbitrary.

Its existence in our system of criminal justice is almost ludicrous. There is no system more carefully designed to assure not simply that the innocent go free, but that at every

step of the way the proceedings are directed toward a rational result. The lengths to which we go to exclude irrelevant evidence, the expenditures made to protect defendants from juror prejudice, the energy, study, and work devoted to a particular prosecution, all of these are prodigious. Having gone through that process, admired by us both for its thoroughness and its goals, astonishing to others for its devotion to fairness and reason, it is incomprehensible that at the very end we should tell those who are to make the judgment that they may do so without regard to anything that went before and without guidance as to why they should disregard what went on before, and without the obligation of explaining why they so disregarded everything. Were anyone to suggest that the police had the right, for no reason whatsoever, to arrest one person but let another escape—intentionally—or that a prosecutor, for no reason whatsoever, and without the need to explain, could prosecute one person but intentionally not prosecute another, or that a grand jury could do the same, where there is no perceptible difference in the two cases, we would either demand the indictment of that policeman and that prosecutor or would immediately pronounce such a suggestion as so lacking in any understanding of the purposes of our criminal justice system as to be not worthy of response. But that is precisely the power that is proposed here to be given to a jury. And were the Legislature to pass a law making a particular course of conduct criminal, and, at the end of that statute, provide that regardless of the proof of criminality the jury shall have the power to acquit, that law would be stricken as unconstitutional.

Jury nullification is an unfortunate but unavoidable power. It should not be advertised, and, to the extent constitutionally permissible, it should be limited. Efforts to protect and expand it are inconsistent with the real values of our system of criminal justice.

Certainly all defendants, we assume, would favor an expansion of jury nullification. They are less concerned with the

inequality that may exist in the arbitrariness of such verdicts than they are with the possibility that an increase in such arbitrariness may benefit them, for, as presently understood, jury nullification benefits only the accused. The basis for our decision, however, has nothing to do with restricting or expanding the rights of the accused. It is concerned with the system itself, its fairness and its rationality. The Constitution does not require acceptance of any proposal, no matter how bizarre, no matter how unreasonable, no matter how likely to produce unequal justice, just so long as it will result in more acquittals.

■ Defendant refers us to the language of the United States Supreme Court in *Duncan v. Louisiana*, 391 *U.S.* 145, 88 *S.Ct.* 1444, 20 *L.Ed.* 2d 491, reh'g den., 392 *U.S.* 947, 88 *S.Ct.* 2270, 20 *L.Ed.* 2d 1412 (1968), the case holding the Sixth Amendment right to an impartial jury applicable to state criminal prosecutions:

> Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.... The deep commitment of the nation to the right of a jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the due process clause of the Fourteenth Amendment, and must therefore be respected by the states.
>
> [*Id.* at 156, 88 *S.Ct.* at 1451, 20 *L.Ed.* 2d at 500 (footnote omitted).]

We agree. The right to trial by jury is intended to protect the citizen from corrupt, overzealous, or arbitrary prosecutors, and from compliant, biased, or eccentric judges; the right to a jury trial, in other words, is his protection against arbitrary law enforcement. It was never designed, however, to protect the defendant from the law, or from the Legislature. It will not do for defendant to recite the acknowledged virtues of jury independence when what is really approved is the dark side of jury nullification.

The difference in this case between the majority and the dissent is narrow. The Court is unanimous in its disapproval of nullification. What separates us are our differing perceptions of the effect of the use of "must." The dissent believes that it

somehow improperly coerces jury deliberations, impermissibly interferes with jury independence, and, in any event, that it can be adequately replaced with less coercive language. The majority finds that when a jury is told that under certain circumstances it "must" find defendant innocent while under other circumstances it "may" find defendant guilty, the risk of nullification is enhanced; and further, that the use of "must" properly states the jury's duty and does not result in the coercion feared by the dissent.

Our review of recent jury charges convinces us that absent some significant tone of voice undisclosed by the record, the numerous variations of charges melt into each other, *none* of them either coercing the jury or suggesting that it is free to ignore the law. By the time one is through reading these charges, it becomes clear that "should," "will," and "must" are probably functionally identical, and the list could go on to include "shall," "it is your duty," "the State is entitled," etc. In that sense we believe that the dissent, even if it prevailed, would not achieve any significant change in our jury system. What is disturbing is that the dissent believes that such a change is necessary. On the contrary, we believe that the last thing a jury needs is a reminder of its ability to let the guilty go free. A trial should be fair to the people, too, not just to the defendant.

We reverse the judgment of the Appellate Division and remand the matter to the trial court for a new trial.

HANDLER, J., concurring in part and dissenting in part.

The Court in this case sustains defendant's claim that in the trial on the charge of possession of a weapon by a convicted felon, the trial court, by referring the jury to its prior finding of possession, in effect directed the return of a guilty verdict, thereby denying defendant's right to a jury trial through what amounts to an improper use of collateral estoppel. As a result, there must be a reversal of defendant's conviction. I agree. In

addition, as noted by the Court, the trial judge instructed the jury that "it must find [the defendant] guilty" if it determined beyond a reasonable doubt that the essential elements of the charged crime had been established. I am of the opinion that this "must-charge" is improper and contributed to the reversible error in this case. This view is at odds with the position taken by a majority of the Court. I therefore dissent.

## I.

Defendant's claims in this case relating to impermissible aspects of the trial court's charge invite our examination of the propriety of the bifurcated or sequential trial that was undertaken in this prosecution. As noted by the majority, in *State v. Ingenito*, 87 *N.J.* 204 (1981), on facts similar to this case, the defendant was first convicted of the unlicensed transfer of weapons. Thereafter, the previously severed charge of possession of a weapon by a convicted felon was tried before a different jury. The only evidence offered at this second trial to prove the possession element was the aforementioned conviction on the unlicensed transfer charge that had been returned by another jury in the first trial. The Court found this to be an unacceptable use of collateral estoppel, concluding that the right to a jury trial requires that "the *same* trier of the fact decide *all* of the elements of the charged offense." *State v. Ingenito, supra,* 87 *N.J.* at 217 (emphasis in original). However, the Court specifically reserved judgment on the validity of the procedure that was followed in this case involving a bifurcated trial by the same jury.

In addressing the validity of this procedure, which is now directly before the Court, we accept as sound the Appellate Division's determination that the proceedings at the trial level constitute a single trial conducted in two phases, rather than two distinct trials. Of critical importance is that this procedure empowers the *same* jury to consider *all* of the evidence and determine *each* of the essential elements that must be proven

to reach a final determination of guilt or innocence on every charge. Because this procedure contemplates independent fact-finding relating to each charge, the impermissible effect of collateral estoppel can be avoided. The bifurcated or sequential trial procedure, properly invoked, fully meets and overcomes the objection underscored in *Ingenito* that the jury responsible for determining guilt or innocence must not be precluded from considering all evidence relevant to the crimes charged and from making independent findings of fact with respect to such crimes.

## II.

As pointed out by the Court, defendant additionally contends that notwithstanding the propriety of the bifurcated trial procedure, the trial court improperly focused the jurors' attention in the second part of the trial upon their earlier finding of possession. Defendant asserts that this amounted to the direction by the court regarding a particular fact-finding on the element of possession that was tantamount to the direction of a guilty verdict. This error was compounded, according to the defendant, by the court's further instruction that the jury, upon finding the elements of the crime, "must find [the defendant] guilty" of the crime charged. I believe defendant's claim has merit. Accordingly, I would regard the use of such language in criminal trial instructions as improper.

The assertion in this case that the trial court's charge to the jury had the effect of directing the return of a guilty verdict implicates the right to a trial by jury in criminal cases guaranteed by both federal and state constitutions. *U.S. Const.* amend. VI; *N.J. Const.* (1947) Art. I, para. 9. This constitutional right imports the participation of a jury that is independent and impartial. We have previously gone to significant lengths, in a variety of contexts, to safeguard the integrity of the jury in the administration of criminal justice, particularly as that bears upon the final determination of ultimate criminal guilt or innocence. *See, e.g., State v. Collier*, 90 *N.J.* 117 (1982); *State v.*

*Ingenito, supra,* 87 *N.J.* 204; *State v. Simon,* 79 *N.J.* 191 (1979).

In this type of sequential trial involving the same jury, as long as the jury is given the opportunity to consider all relevant evidence and is not prevented or inhibited from making independent fact-findings with respect to each criminal charge, the State should be free to rely on evidence introduced in the course of the entire trial proceedings. In particular, the jury should be able to consider in the subsequent or second phase of the trial proceedings any evidence that is relevant to the remaining charge then being tried even though it was introduced in the earlier phase of the trial. If in the second phase of a bifurcated trial the State seeks to rely on such earlier-introduced evidence, the court in its charge may refer to that evidence but should not otherwise induce the jury to make a particular finding or to reach a particular verdict based upon that evidence.

In this case, the trial court did not, in the second phase of the trial, merely refer to the earlier-introduced evidence relating to possession. Rather, it specifically focused the jury's attention upon its previous fact-finding of possession. In doing so, the court failed to make it clear to the jury that it was required to make a new and independent finding regarding this element of the charge then being tried. *See State v. Ingenito, supra,* 87 *N.J.* 204. Thus, as pointed out by the majority, the trial court's instruction could have been interpreted by the jury as a direction or strong suggestion that it not simply consider and weigh the evidence of possession, but also that it need only adopt its prior fact-finding or make a finding that would be consistent with its prior determination of the element of possession. In this posture, the potential harm is reminiscent of that considered in *State v. Collier, supra,* 90 *N.J.* 117.

Thus, I agree with the Court that to avoid this kind of error, the trial judge in this case should have clearly instructed the jury in the second phase of the trial that it must determine whether the evidence, including that evidence previously ad-

duced in the first phase of the trial, established beyond a reasonable doubt the element of possession as it relates to the charge then being tried, namely, the possession of a weapon by a convicted felon. The trial judge, however, should not have referred the jury to its earlier finding of fact or determination of this essential element. Adherence to these guidelines would have secured the economies of the successive-phase trial, avoided the pitfall of collateral estoppel, vindicated the ultimate independence of the jury, and preserved the defendant's right to a fair and full jury trial on all charges.

As noted, the prejudicial effect of the trial court's charge was aggravated by another related aspect of the court's instructions. In the course of instructing the jury as to the consequences of a determination of the elements of the crime, the trial court reminded the jury of its previous determination of possession, charging the jury that upon finding the elements of the offense, it "must find [the defendant] guilty." In my opinion, this so-called must-charge implicated not simply the jury's independent role in making findings of fact, but its singular responsibility for determining ultimate criminal guilt or innocence.

We have generally accorded the jury a unique assignment in the trial of criminal cases, reflecting our acceptance of the jury as society's surrogate in the effectuation of its criminal laws. The jury acts as "the conscience of the community and the embodiment of the common sense and feelings reflective of society as a whole," *State v. Ingenito, supra,* 87 *N.J.* at 212. This reserved freedom of conscience in a jury has not generally been considered either mysterious or mischievous (*cf. supra* at 204–207). The ultimate discretion accorded to a jury in a criminal case is deeply embedded in our jurisprudence and has served society well. *See* Thomas A. Green, *Verdict According to Conscience: Perspectives on the English Criminal Trial Jury: 1200–1800* (Univ. of Chicago, 1985) (ability of jury to express its conscience is the distinguishing historical characteristic of the jury system in the administration of criminal jus-

tice). Hence, the jury in a criminal case may return "a verdict of innocence in the face of overwhelming evidence of guilt." *State v. Cristanos (Arriagas),* 102 *N.J.* 265, 272 (1986) (quoting *State v. Ingenito, supra,* 87 *N.J.* at 212); *see State v. Champa,* — *R.I.* —, —, 494 *A.*2d 102, 106 (1985). "A jury may acquit or convict on a lesser charge even though the greater charge is satisfactorily proven beyond a reasonable doubt ... [and] may return illogical or inconsistent verdicts that would not be tolerated in civil trials." *State v. Cristanos (Arriagas), supra,* 102 *N.J.* at 272 (citations omitted). As Justice Holmes observed, "the jury has the power to bring in a verdict in the teeth of both law and fact." *Horning v. District of Columbia,* 254 *U.S.* 135, 138, 41 *S.Ct.* 53, 65 *L.Ed.* 185, 186–87 (1920). Thus, a court cannot by a mandatory instruction require the jury to bring in a verdict of guilty in a criminal case no matter how compelling the evidence. *State v. Collier, supra,* 90 *N.J.* at 122; *see Sandstrom v. Montana,* 442 *U.S.* 510, 516 n. 5, 99 *S.Ct.* 2450, 2455 n. 5, 61 *L.Ed.* 2d 39, 46 n. 5 (1979); *United States v. Martin Linen Supply Co.,* 430 *U.S.* 564, 572–73, 97 *S.Ct.* 1349, 1355–56, 51 *L.Ed.* 2d 642, 652 (1977).

I believe that, in the context of the entire charge, the language that commanded the jury, "you *must* find [the defendant] guilty," had the potential to be construed, or misconstrued, as a direction or order to return a verdict of criminal guilt; if so understood, it would impermissibly preempt the jury from its sole and exclusive responsibility of determining ultimate criminal guilt or innocence. This language, particularly when coupled with any other errors touching upon the evidence in the case or the jury's fact-finding function, generates a risk that it will be understood and applied by a jury as a judicial direction for the return of a verdict of criminal guilt.

Other courts have sensed the infirmity of an instruction that conveys such a command. This language weakens the prerogative of a jury to "disbelieve any fact testimony or reject any factual results, uncontradicted or not." *People v. Gillespie,* 54 *Mich.App.* 419, 221 *N.W.*2d 246, 247 (1974); *see United States*

*v. Moylan,* 417 *F.*2d 1002, 1006 (4th Cir.1969), *cert.* denied, 397 *U.S.* 910, 90 *S.Ct.* 908, 25 *L.Ed.*2d 91 (1970). Additionally, an instruction that mandates a particular legal consequence stemming directly from specific fact-findings is inherently flawed. *See United States v. Hayward,* 420 *F.*2d 142, 144 (D.C.Cir.1969) ("By instructing the jurors that they *must* find the defendant guilty if they determined that the evidence placed him at the scene of the crime, the court took from the jury an essential element of its function") (emphasis in original); *Brascomb v. State,* 261 *Ark.* 614, 617, 550 *S.W.*2d 450, 452 (1977) (binding instructions should be avoided whenever possible " 'because of the impracticability of stating all the various propositions of law involved in one instruction' "), quoting *Moore v. State,* 252 *Ark.* 526, 479 *S.W.*2d 857, 859 (1972).

I readily acknowledge that the actual impact upon a jury of this controverted language is not demonstrable. Concededly, this commanding charge will not always or necessarily result in the judicial direction of a guilty verdict. *E.g., State v. Lovelace,* 227 *Kan.* 348, 607 *P.*2d 49 (1980); *State v. Devoe,* 301 *A.*2d 541 (Me.1973); *Straughter v. State,* 247 *A.*2d 202 (Del.1968). *Compare Watts v. United States,* 328 *A.*2d 770, 773 (D.C.1974) ("use of the phrase 'must find the defendant guilty' could have been erroneously construed by the jury as denying its prerogative of finding the defendant not guilty, notwithstanding the evidence") *with Watts v. United States,* 362 *A.*2d 706 (D.C. 1976) *rehearing (en banc)* (an instruction to a jury that if it found the government had proven the existence of each element of the offense beyond a reasonable doubt, "then you *must* find the defendant guilty as charged" was not equivalent to a directed verdict of guilty). Additionally, as emphasized by the majority, this vigorous instruction, though not uniform or consistent either in our jurisdiction or elsewhere, is fairly common, thereby suggesting that its use may comport with conventional wisdom.

Nevertheless, I am satisfied that the sounder and more accurate assessment of this language will recognize its poten-

tial for going beyond simply exhorting jurors to perform their expected duties or to be faithful to their oaths.[1]  *See Billeci v. United States,* 87 *U.S.App.D.C.* 274, 184 *F.*2d 394, 399 (1950) ("must" charge "is not the law.  The law is that if the jury believes beyond a reasonable doubt that the defendant has committed the offense it *should* find a verdict of guilty, but if there be a reasonable doubt in the minds of the jurors they *must* acquit.") (emphasis in original).  An instruction possessing this compulsive connotation stands at variance with the fine discretion that a jury must exercise when considering the myriad factors, definable and indefinable, obvious and subliminal, that bear upon the ultimate determination of criminal guilt or innocence.  Against this risk of subtle but real prejudice, I do not see any actual benefit to be derived from the use of this language.  Accordingly, I think it advisable that such language be discontinued because of its potential to be interpreted in a manner that compromises jury independence and blurs the accepted dichotomy between judge and jury.

This language, moreover, is not essential in describing to a jury its crucial responsibility—the final determination of ultimate criminal guilt or innocence.  Trial judges in all criminal cases should charge the jury generally in a manner that conveys to the jury an understanding of its essential and exclusive role.  This entails determining the facts based solely on evidence presented at trial, making such fact-findings with respect

---

[1] It is clear that a juror's oath does not include any vow to return a guilty verdict when requisite evidence demonstrates guilt or a pledge not to acquit when confronted by such evidence of guilt.  The general juror's oath requires a juror only to uphold the federal and state constitutions and to swear that he or she does not advocate the violent overthrow of the government nor belong to any organization that so advocates.  *N.J.S.A.* 2A:69–1.1.  The oath administered to jurors selected enjoins the juror to give "a true verdict ... according to the evidence." *N.J.S.A.* 2A:74–6.  This oath has survived virtually unchanged from the early common law, 3 W. Blackstone, *Commentaries* 365, and has coexisted with the accepted understanding of the juror's freedom of conscience in terms of determining ultimate guilt or innocence. *See* discussion, *supra,* at 217.

to each essential element of the charged crime beyond a reasonable doubt, and accepting and applying to its particular factual determinations the law as it has been explained by the court. The jury should be made to understand that the honest and conscientious performance of these functions in fulfillment of its special role will enable it to reach a verdict of criminal guilt or innocence that will be considered valid and proper under the law.

To communicate this basic understanding to the jury it would, in my view, be appropriate to instruct the jury in relevant measure as follows: if the jury has independently determined that each essential element of the crime charged has been established beyond a reasonable doubt by the evidence presented in the course of the trial, then, under the law, (1) it has the responsibility to return a guilty verdict, or alternatively, (2) it should return a guilty verdict, or alternatively, (3) the State is entitled to the return of a guilty verdict. Although there may be other comparable formulations, I believe these proffered instructions achieve the objectives of conveying to the jury the essence of its responsibility to determine ultimate criminal guilt or innocence, providing the jury with firm guidance, vindicating the administration of criminal justice under law, and preserving jury independence.

While my views on the use of the so-called must-charge are different from the majority's, I agree with the Court that a defendant is not entitled to an instruction advising the jury in a criminal prosecution of its unreviewable prerogative to acquit a defendant even though guilty-in-fact. Although we recognize that a judge is powerless in a criminal case to review and overturn a verdict of not guilty, we do not endorse the proposition that recognition of a jury's prerogative to acquit in any case compels acknowledgement of a cognizable right or legally enforceable power in a jury to return verdicts contrary to the law as applied to proffered evidence. *See United States v. Dougherty*, 473 *F*.2d 1113, 1133–34 (D.C.Cir.1972); *State v. Perkins*, 353 *N.W*.2d 557, 561 (Minn.1984); *State v. Collier*,

*supra*, 90 *N.J.* 117; *People v. St. Cyr*, 129 *Mich.App.* 471, 472, 341 *N.W.*2d 533, 534 (1983); Tavris, "The Law Of An Unwritten Law: A Common Sense View of Jury Nullification," 11 *W. State Univ.L.Rev.* 97, 104 (1983). An explicit instruction that would require jurors affirmatively to consider such a prerogative possesses the countervailing potential of encouraging jurors to disregard their basic responsibilities of accepting the law as explained by the court, finding the facts beyond a reasonable doubt based solely upon evidence presented in the course of trial, and determining ultimate guilt or innocence in accordance with its fact-findings and the applicable law. *See United States v. Dougherty, supra,* 473 *F.*2d at 1136–37; *United States v. Simpson,* 460 *F.*2d 515 (9th Cir.1972); *United States v. Moylan, supra,* 417 *F.*2d at 1009; *State v. Champa, supra,* —— *R.I.* at ——, 494 *A.*2d at 106; *Arshack v. United States,* 321 *A.*2d 845, 851 (D.C.1974). However, it simply does not follow, from the absence of a right to an instruction that the jury may nullify the law, that no compulsion results from an instruction that the jury must convict. Even the leading judicial repudiation of a right to a nullification instruction, *United States v. Dougherty, supra,* 473 *F.*2d at 1138, concluded by noting that "[t]he jury were not told they *must* bring in a guilty verdict...." (Emphasis added.) Hence, while I disagree with the majority as to the effect of the must-charge, I am comfortable with the prevailing view, which recognizes that "tacit toleration of jury verdicts of innocence, in apparent contradiction to clear proof of guilt, affords adequate protection" of a defendant's entitlement to a trial by an impartial and independent jury. *United States v. Anderson,* 716 *F.*2d 446, 450 (7th Cir.1983); *United States v. Dougherty, supra,* 473 *F.* 2d at 1135; *United States v. Simpson, supra,* 460 *F.*2d at 519–20 n. 12; *Watts v. United States, supra,* 362 *A.*2d at 710 n. 5.

For these reasons, I dissent in part from the Court's opinion, concurring in the balance of its opinion and its judgment reversing the conviction.

Justices POLLOCK and O'HERN join in this opinion.

HANDLER, POLLOCK and O'HERN, JJ., concurring in result.

*For reversal* —Chief Justice WILENTZ, and Justices CLIFFORD, GARIBALDI, STEIN, HANDLER, POLLOCK and O'HERN—7.

*For affirmance* —none.